**Edward Lee SMITH, Appellant,**

v.

**Ira M. COINER, Warden of the West Virginia State Penitentiary, Appellee.**

**No. 71–1535.**

United States Court of Appeals, Fourth Circuit.

Argued Sept. 14, 1972.

Decided Feb. 1, 1973.

William H. Ledbetter, Jr., Fredericksburg, Va. (Court-appointed counsel), for appellant.

Willard A. Sullivan, Asst. Atty. Gen. of West Virginia (Chauncey H. Browning, Jr., Atty. Gen. of West Virginia, and Richard E. Hardison, Asst. Atty. Gen. of West Virginia, on brief), for appellee.

Before WINTER and BUTZNER, Circuit Judges, and MURRAY, District Judge.

WINTER, Circuit Judge:

After exhausting available state post conviction remedies, Edward Lee Smith sought a federal writ of habeas corpus to set aside his state conviction for the rape of a seventy-two-year-old widow. The district court conducted a plenary hearing but found lacking in merit Smith's contentions that he had been denied due process of law. Smith argued that due process had been denied because (a) the trial jury had been coerced into finding him guilty, (b) he lacked counsel when the prosecutrix identified him as her attacker, and (c) the state's evidence in its direct case that the prosecutrix had identified him as her attacker in a one-to-one confrontation shortly after the commission of the offense was unduly suggestive under the circumstances surrounding the identification. As to the latter contentions, the district court, without passing on the validity of the one-to-one confrontation or the claimed denial of the right to counsel, concluded that an in-court identification by the prosecutrix was not tainted by the earlier identification and the in-court identification provided a valid basis upon which the jury could have found Smith guilty.

We disagree. We think that the one-to-one confrontation under the circumstances denied Smith's right to due process and that evidence of the prosecutrix's identification as part of the government's direct case fatally infected the trial. Since we cannot conclude that this evidence was harmless beyond a reasonable doubt, Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967), we reverse the judgment of the district court and direct that the writ issue unless the state affords Smith a new trial within a reasonable period to be fixed by the district court. Because of our conclusion with respect to the evidence of the out-of-court identification, we do not reach Smith's other basic contention that the jury was coerced into finding him guilty. It arose from circumstances which are unlikely to recur if Smith is tried anew, and the issue we do decide is sufficient, standing alone, to warrant relief.

I.

On February 1, 1968, during the morning hours before dawn, the prosecutrix was awakened by an intruder and raped in the bedroom of her home in Franklin, West Virginia. The incident occurred in the dark although the prosecutrix saw her assailant for "two seconds" by using a flashlight that she had in her room. The prosecutrix wore glasses all of the time, and she had been under treatment for cataracts for two years, without improvement. She was not wearing her glasses when she saw her assailant and she subsequently described him as somewhat resembling an-

other man in the community who, another witness testified, was about fifty years old.

About three hours after the incident, Smith was found asleep, partially undressed, in the prosecutrix's bed. He was discovered by the son of the prosecutrix and a police officer whom the son had summoned, both of whom had gone to her house after she had gone to her son's house to report what had happened. Smith was awakened and was immediately arrested. When he was dressed, he was advised that he had a right to remain silent, that he had a right to have a lawyer represent him, and that any statement he made could be used against him. He declined to make a statement. After he was booked, he was taken in handcuffs to a doctor's office where the prosecutrix was being examined and treated. In handcuffs and with a state policeman at each arm, he was exhibited to the prosecutrix who identified him as her attacker. He had been given no opportunity to obtain counsel or to request that counsel be appointed to represent him. Evidence of the identification at the doctor's office was part of the state's direct case at trial. At trial, the prosecutrix also made an in-court identification.

According to Smith, he happened to be in the prosecutrix's bed under these circumstances: The afternoon before, Smith, who was working in the vicinity, began drinking with friends before returning to his home in Virginia. About 2:00 a. m., he began the journey home in his truck. He picked up a hitchhiker who was older and heavier than Smith. Shortly thereafter Smith stopped the truck because he was so sleepy. The hitchhiker left and Smith went to sleep. Later the hitchhiker returned, awakened Smith and took him to a house, subsequently determined to be the house of the prosecutrix. He was shown by the hitchhiker to a room with an empty bed. When the hitchhiker left the room, Smith partially undressed, went to bed and went back to sleep. Smith said that he did not know whose house it was nor the identity of the hitchhiker. The hitchhiker was not seen again, nor was any attempt made by the police to locate him. Smith remained asleep until awakened by the police officer. He denied seeing the prosecutrix or raping her.

Although, if Smith's version of the facts is true, this is a bizarre case, yet it cannot be said that Smith's version is inconsistent with the other facts of record. After being raped the victim left her bedroom, leaving her assailant in the bed, and locked herself in a downstairs bathroom for a period of time, where she dressed. She then walked about a quarter of a mile to her son's home to report the incident. The record is imprecise, but a considerable period of time may have elapsed between commission of the crime and Smith's discovery because the victim thought that the crime was committed about 4:30 a. m. and the son thought that his mother had arrived at his house about 7:00 a. m.

While the record shows that initial entry to the prosecutrix's house was obtained by someone's climbing on to a porch roof and breaking a second story window, Smith said that he entered by a door opened by the hitchhiker. The window broken was in another bedroom which did not connect with the bedroom in which the victim was sleeping except via the first floor. The prosecutrix testified that the doors were locked when she retired, but she was not asked if she left the door unlocked when she went to her son's house. The son testified that when he arrived with the police the door was ajar. Smith said that the porch light was on when he entered and the victim said that the porch light was turned on by the rapist before he came upstairs and attacked her.

According to Smith, he stated that he had been in the company of a hitchhiker immediately after he was awakened and learned that the crime had been committed, but the police and the son would not listen to him. The police deny that he mentioned a hitchhiker at that time, but one policeman admitted that a hitchhiker was mentioned as soon as Smith was

taken to the police station before being taken to the doctor's office. No investigation was made of Smith's claim that he had been in the company of a hitchhiker, nor was any attempt made to locate the alleged hitchhiker.

Chemical tests disclosed the presence of sperm on the bed linens of the bed in which Smith was found asleep but not on Smith's underclothing in which he was sleeping nor on his handkerchief.

All witnesses agreed that Smith's truck was parked in plain view of the victim's house.

## II.

■ Smith argues that under the *per se* exclusionary rule of United States v. Wade, 388 U.S. 244, 87 S.Ct. 1926, 18 L. Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), his conviction must be set aside because he neither had nor had he waived counsel when he was exhibited to the proscutrix in the doctor's office. This contention is severely shaken by Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), decided after Smith's brief was filed. In *Kirby*, it was held that an individual has no right to counsel at a pre-indictment lineup; therefore, the *per se* exclusionary rule of *Wade* and *Gilbert* would not apply to identification testimony based upon such a confrontation. Smith was not indicted until after he was identified by the prosecutrix. Although *Kirby* may be read to extend the right to counsel to points of time earlier than the indictment, i. e., "points of time at or after the initiation of adversary judicial criminal proceedings— whether by way of *formal charge*, preliminary hearing, indictment, information, or arraignment" (emphasis supplied) (Kirby v. Illinois, 406 U.S. 682 at 689, 92 S.Ct. 1877 at 1882, 32 L.Ed.2d 411 at 417), we do not consider whether adversary criminal proceedings, other than an indictment, had been begun against Smith at the time of the confrontation because of the paucity of the record in this regard. Rather, we turn to a consideration of whether the confrontation was unduly suggestive, a valid due process objection which was recognized in *Kirby*.

## III.

In Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the Court, while holding that the Wade-Gilbert *per se* exclusionary rule should not be applied retroactively to confrontations which took place prior to the date of those decisions, nevertheless held that a confrontation, not barred by *Wade* and *Gilbert*, may be "so unnecessarily suggestive and conducive to irreparable mistaken identification that he [defendant] was denied due process of law." 388 U.S. at 302, 87 S.Ct. at 1972. Cited in support of the stated rule was our own decision in Palmer v. Peyton, 359 F.2d 199 (4 Cir. 1966). See also Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In Kirby v. Illinois, in concluding that the Wade-Gilbert *per se* exclusionary rule should not be applied until adversary judicial criminal proceedings had begun, the Court repeated that confrontations, immune to attack under *Kirby*, could still be violative of due process rights if they were "unnecessarily suggestive and conducive to irreparable mistaken identification." 406 U.S. 682 at 691, 92 S.Ct. 1877 at 1883, 32 L.Ed.2d 411 at 418.

In *Stovall*, where there was a one-to-one confrontation in a hospital room where the victim was thought to have not long to live, the Court recognized that "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." 388 U.S. at 302, 87 S.Ct. at 1972. We certainly agree because the accuracy of an identification depends in large part upon the objectivity with which the confrontation is conducted. Greater accuracy can be assured when a suspect is exhibited to a witness in the company of others having similar facial and physical characteristics under circumstances where the mind of the beholder is not

affected by intended or unintended, blatant or subtle, suggestions of the suspect's probable guilt.

In *Stovall,* the rule was laid down that whether a given confrontation denied due process of law depended upon the totality of the circumstances surrounding it; and in *Stovall,* the identification was held not to deny due process because the possible imminent death of the victim rendered not feasible any other way in which she could say that Stovall was or was not her assailant. Although *Stovall* approved a one-to-one confrontation under the totality of the circumstances present there, important factual differences exist between *Stovall* and the instant case. When we apply the totality of circumstances test here, we conclude that Smith was denied due process of law.

The prosecutrix was in no physical danger at the time that the confrontation in the doctor's office took place and that office was only a short distance from the police station. At the time that Smith was exhibited to her he was handcuffed and escorted by two uniformed police officers. The manner of exhibition, although properly motivated by considerations of security, thus carried with it an implied suggestion by the police that they believed Smith was the guilty party. There is no claim that the prosecutrix would have been unable to attend a lineup when she left the doctor's office or thereafter, and there is no suggestion that the identification in this case was part of an on-the-scene immediate investigation such as has been held unobjectionable in other cases. See Russell v. United States, 133 U.S.App. D.C. 77, 408 F.2d 1280 (1969); United States v. Perry, 145 U.S.App.D.C. 364, 449 F.2d 1026 (1971); United States v. Hines, 147 U.S.App.D.C. 249, 455 F.2d 1317 (1972). It should be noted that in each of these cases the confrontation occurred promptly after commission of the crime, the police had obtained a good description of the offender, and under the circumstances it was important to continue the search for the real culprit promptly if he had not been apprehended. Here the confrontation was over five hours later (See McRae v. United States, 137 U.S.App.D.C. 80, 420 F.2d 1283 (1969) where evidence of a confrontation four hours after the crime was committed was ruled inadmissible), the victim gave little if any description of her assailant, and none to the police as will be hereafter developed, and the police were so certain that they had the real culprit that they in effect had determined to make no further investigation. The showup here was not conducted for any of the reasons or under any of the circumstances relied on to sustain the validity of the confrontations in *Russell, Perry* and *Hines.*

In short, there was no justification for incurring the inherent suggestiveness of a one-to-one confrontation under the circumstances described, nor was there any reason why a traditional and non-suggestive lineup could not have been employed other than the testimony of a state police officer that "[w]e have no lineups here," and a request by counsel in argument that we take judicial notice that Franklin, West Virginia is a small community and thus was unable to provide enough people to hold a lineup. With regard to the latter, the record shows that Franklin is a community of about 1,000 persons. We do not think that it is so small as to provide justification for the highly suggestive procedure used in this case. A lineup need not be restricted to other prisoners, nor is there any prohibition against recruiting participants from other more populous communities. The fact that lineups have not heretofore been conducted in Franklin, West Virginia is no answer. Thus, we conclude that, under the totality of the circumstances present here, the confrontation was so unnecessarily suggestive and conducive to irreparable mistaken identification that admission into evidence as part of the government's direct case of evidence of the identification made at the confrontation was a denial of Smith's right to due process.

The recent decision of the Supreme Court in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), in our view, has no application to this case. In *Neil*, the rule was stated that the admissibility of an identification obtained as a result of a suggestive confrontation was to be determined by the likelihood of misidentification, in short, by its reliability, taking into account the totality of the circumstances surrounding the making of the identification. The *Neil* rule, as the opinion makes clear (at 198, 93 S.Ct. 375), applies to pre-*Stovall* cases since police officers, prosecutors and other law enforcement officers were not then aware that "suggestiveness of confrontation procedures was anything other than a matter to be argued to the jury." (at 199, 93 S.Ct. at 382.). In contrast, in post-*Stovall* cases, of which the instant case is one, the rule to be applied is the *Stovall* rule, i. e., whether the confrontation was so unnecessarily suggestive and conducive to irreparable mistaken identification as to amount to a denial of due process of law. In post-*Stovall* cases, "[s]uggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." (at 198, 93 S.Ct. at 382.). The shift in emphasis from unnecessarily suggestive confrontations (post-*Stovall* cases) to reliability of identification (pre-*Stovall* cases) is explained by the need, once *Stovall* was decided, "to deter the police from using a less reliable procedure where a more reliable one may be available." (At 199, 93 S.Ct. at 382.).

While we think *Neil* inapposite, we do not think that the identification by the victim in the doctor's office was admissible even under the *Neil* test. Writing for the majority in Neil, Mr. Justice Powell said:

> . . . the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

(At 199,, 93 S.Ct. at 382.).

In the instant case, the victim, while undoubtedly attentive, agreed that she saw her assailant for only "two seconds" by the light of a flashlight. A person with impaired vision, she was not wearing her glasses at the time. It is true that the confrontation followed promptly after the commission of the crime, but the record is totally lacking in any real corroborative evidence that the victim had a specific person in mind, other than one who was white, who she thought was her assailant prior to the confrontation. The record shows extreme sensitivity on the part of the victim when questioned about what description, if any, she had given prior to the confrontation. When asked if she gave a description to the doctor of anyone other than Smith, she denied doing so; yet, in the next breath, she admitted saying to the doctor that her assailant "had a little resemblance [to Max], I mean his features." The doctor testified that the victim had said that her assailant "didn't seem too tall," that her assailant "resembled" Mac Roe and that Mr. Roe is about fifty. The victim's son testified that his mother described her assailant as "slender and a long-faced person" and "[o]ther than that she really. didn't have too much of a description." The son did not recall what she said about his age. When pressed on cross-examination, the victim said that she did not recall what she told the police about the victim's age, but that "[m]y statement says twenty-six or seven." It appears, however, from the testimony of the police that *they did not interview the victim until after the confrontation and even then they sought no description because she had already identified Smith.* While the record

shows that Smith was twenty-six, it fails to show his height, build or facial characteristics. His approximate age, however, should have been no secret to one who had been a party to the confrontation.

*Neil* permits admissibility of an identification resulting from a suggestive confrontation only when there is substantial reliability of the identification. We think the requisite degree of reliability is absent here.

## IV.

We cannot conclude that, beyond a reasonable doubt, the evidence of the impermissible confrontation as part of the state's direct case was harmless error. Chapman v. California, supra. The in-court identification by the prosecutrix, who was the only witness to the attack, had inherent weaknesses. The prosecutrix was shown to have very poor eyesight and to have seen her attacker without her glasses and only by the use of a flashlight for a few seconds. The in-court identification of the prosecutrix, as well as her identification at the confrontation in the doctor's office, was not entirely consistent with the limited verbal description she gave before she first saw Smith. She described her attacker as a man resembling one approximately fifty years old, while the record shows that Smith was twenty-six.

Given these infirmities in the in-court identification, we cannot say that beyond a reasonable doubt a jury would be unaffected by the evidence that she identified Smith in the doctor's office. Even if the testimony of the prosecutrix is read to establish that the in-court identification had an independent basis, a trier of the fact might well conclude that an identification made within hours after the crime would bolster and make credible an in-court identification by a woman with impaired sight after the lapse of considerable time. While the discovery of Smith in the prosecutrix's bed was strong circumstantial evidence of his guilt, we cannot say that Smith's version of what occurred was totally implausible. It was consistent with the other facts which were proved and Smith could have been an innocent second victim, rather than an incredibly stupid rapist who would go to sleep in his victim's bed and leave his motor vehicle within sight of his victim's house, unless we are prepared to say that Smith was incredible as a matter of law. While Smith was an impeachable witness, we do not think that we would be warranted in usurping the jury's functions as the trier of the facts and the judge of credibility. Moreover, this is not a case in which there were other eyewitnesses, nor can it be said that the prosecutrix's in-court identification was unequivocally made independently of the pre-trial confrontation. See United States v. Cunningham, 423 F.2d 1269 (4 Cir. 1970).

Although the present conviction cannot stand, on retrial the prosecutrix will not be barred from making a second in-court identification if she can show credibly that her ability to identify Smith at that future date was unaffected by the impermissible one-to-one confrontation which occurred. Evidence of whether there may be an independent, untainted source for a second in-court identification will, of course, be required to be taken out of the presence of the jury, and the trial judge will be required to make findings and a ruling.

For these reasons, we reverse the judgment of the district court and direct that the writ of habeas corpus issue. Issuance may be stayed, however, by the district court for a reasonable period to enable the State of West Virginia to retry Smith if it be so advised.

Reversed and remanded.

MURRAY, District Judge:

I respectfully dissent. In my view, the one-to-one confrontation under the circumstances in this case did not deny the defendant Smith's right to due process and therefore the use of the prosecutrix's identification as part of the government's direct case was proper.

While it is true that the attack upon the prosecutrix took place in the hours of darkness, she had already been awakened by a noise which she heard in her home and was trying to reach her son on the telephone when her attacker appeared in the doorway of her bedroom. She held a flashlight in her hand which she was using to see the number she was dialing and shone it on the man in her doorway. She got more than a fleeting glimpse of the man: "I saw him well enough to know he was white and his features". Her eyes must have become accustomed to the darkness for she further testified:

"Well, I started to draw a picture of him, his height and I knew he was white and then he attacked me."

The sexual attack began when the attacker threw the victim to the floor and was later continued by him on the bed. After the attack, the victim apparently waited until her attacker fell asleep beside her before stealing downstairs to lock herself in the bathroom. She estimated she remained in the bed after the attack about ten minutes. After dressing in some old clothes in the downstairs bathroom, she slipped out the rear door of the house and walked a quarter of a mile to report the attack to her son who then summoned police.

Two police officers went directly to the scene and entered through the rear door that the victim had left open. Finding nothing downstairs, they went to the victim's bedroom where they found the defendant asleep in the victim's bed. They got him out of bed and took him into the town of Franklin, West Virginia. After he was booked, he was taken across the street to the doctor's office where the victim was being examined and treated. As stated in the majority opinion, the defendant at the time was in handcuffs and in the company of two officers. When he was exhibited to the victim no statement was made by the officers, but she identified him as her attacker.

The defendant had previously been advised by the officers that he was entitled to a lawyer if he wanted one and that if he didn't have the funds to employ a lawyer, they would see that the Court appointed a lawyer for him. There is no indication from the record that the defendant ever requested that a lawyer be appointed.

As Judge O'Sullivan[1] indicated in Roper v. Beto, 454 F.2d 499 (5th Cir. 1972):

"One man showups have not been adjudged per se violative of due process. They have been condemned as suggestive, but whether a particular showup and identification violates due process is dependent on the 'totality of the circumstances.' The particular concern of the courts is whether the showup has produced reliable identification evidence or the likelihood of misidentification." Id. at 502.

In the case of Bates v. United States, 132 U.S.App.D.C. 36, 405 F.2d 1104 (1968), then Circuit Judge, now Chief Justice Burger was dealing with the question of whether an identification of an alleged sexual attacker by one of the complaining witnesses was the result of an unnecessarily suggestive confrontation under Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). A suspect was picked up by the police shortly after the attack took place in the bedroom of the victim. The complaining witnesses were asked to come down to the street at midnight to view the defendant who was the sole occupant of a police patrol wagon. The victim did identify the defendant on this "showup" and later identified him in court as her attacker during the trial.

With regard to the reliability of such a show-up, Judge Burger stated:

"There is no prohibition against a viewing of a suspect alone in what is called a 'one-man showup' when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification

---

1. Senior Circuit Judge, Sixth Circuit, sitting by designation.

but rather tends under some circumstances to insure accuracy. The rationale underlying this is in some respects not unlike that which the law relies on to make an exception to the hearsay rule, allowing spontaneous utterances a standing which they would not be given if uttered at a later point in time. An early identification is not error. Of course, proof of infirmities and subjective factors, such as hysteria of a witness, can be explored on cross-examination and in argument. Prudent police work would confine these on-the-spot identifications to situations in which possible doubts as to identification needed to be resolved promptly; absent such need the conventional line-up viewing is the appropriate procedure.

"Our review of the circumstances surrounding the apprehension of Appellant and the police conduct which led to his identification satisfies us that the claim that Appellant was denied due process of law is without merit; there was no 'substantial likelihood of irreparable *misidentification*.' To the contrary, the police action in returning the suspect to the vicinity of the crime for immediate identification in circumstances such as these fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh." Id., 405 F.2d at 1106.

In the present case, it appears reasonable to assume that the officers, having found the defendant in the bed of a lady reported by her son to have been raped, wanted to take the man before the victim at the earliest possible time so that she could confirm whether or not the man in question was her attacker. Also, the officers undoubtedly would not want to detain even a person found in the bed of a raped victim any longer than necessary if indeed he were not the attacker.

The Court may take judicial notice of the fact that according to the 1970 Census, Franklin, West Virginia had a population of 695 people. Therefore, arranging a line-up in 1968 which would be composed of persons unknown to the victim undoubtedly would take a period of time. Additionally, here the police had not apprehended someone merely from a description, but had the strongly suggestive circumstance of the arrestee being found in the victim's bed. To follow up the arrest by showing this man to the victim certainly does not seem an unreasonable police procedure.

Since the decision by then Circuit, now Chief Justice Burger in *Bates, supra,* the Court of Appeals for the District of Columbia Circuit in a number of carefully considered opinions has held that a one-on-one show-up at or near the scene of the crime and within a relatively short time thereafter is not violative of the due process rights of a defendant. Russell v. United States, 133 U.S.App. D.C. 77, 408 F.2d 1280 (1969), cert. den., 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245; United States v. Perry, 145 U.S.App.D.C. 364, 449 F.2d 1026 (1971); United States v. Hines, 147 U.S.App.D.C. 249, 455 F.2d 1317 (1972), cert. den., 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675. The reasoning of those cases would appear to apply with equal validity to the situation in this case where the confrontation is in a doctor's office within a few hours of the crime. As Chief Judge Bazelon observed in *Russell*:

" * * * [I]t appears that prompt confrontation in circumstances like those of this case will 'if anything promote fairness, by assuring reliability * * *.' This probability, together with the desirability of expeditious release of innocent suspects, presents 'substantial countervailing policy considerations' which we are reluctant to assume the Supreme Court would reject." 408 F.2d at 1284.

In *Perry,* Judge Robinson emphasized that among the interests to be considered are:

" * * * [T]he combined needs for fast and effective police action in apprehending criminals, and the avoidance of unnecessary inconvenience and embarrassment to innocent citizens incidental thereto. By such confrontations, a suspect not identified as the perpetrator of the crime is exonerated forthwith without being hauled to a police facility for a lineup, and possibly without suffering an arrest. Simultaneously, the police can quickly ascertain the necessity for any further investigation and search for the real culprit. Such confrontations, then, serve also to protect the innocent, and to promote efficiency in the deployment of limited police resources." 449 F.2d at 1033.

In the context of a federal prosecution, the decision of this court in United States v. Levi, 405 F.2d 380 (4th Cir. 1968), is instructive. That case dealt with the armed robbery of a bank in Maryland by two men armed with a shotgun and a pistol. An assistant bank manager, following the robbery, was advised by FBI agents that they would bring someone to the bank to see whether he could identify the man as one of the robbers. The agents brought the defendant Levi to the bank some four months after the robbery occurred and the bank manager identified the defendant as one of the robbers. He also made an identification at trial a year later. On appeal, the defendant urged that the pre-trial showing on a one-on-one basis for purposes of identification was so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny him due process of law. However, this court apparently did not consider that any suggestiveness in the identification procedure used posed an issue of constitutional dimensions, but rather that the sufficiency of the identification testimony was a matter for jury determination under proper instructions from the court. In this regard, Judge Craven stated in his opinion:

"In response to recurrent appeals questioning the sufficiency of one-on-one positive identification testimony to support a conviction, the Court of Appeals for the District of Columbia has promulgated a rule that when the defendant has placed his identification in issue, it is incumbent upon the trial court, on request, to specially instruct the jury (1) 'that the evidence raises the question of whether the defendant was in fact the criminal actor and necessitates the juror's resolving any conflict in testimony upon this issue,' and (2) 'that the burden of proof is upon the prosecution with reference to every element of the crime charged and this burden includes the burden of proving beyond a reasonable doubt the identity of the defendants as the perpetrator of the crime charged.' Jones v. United States, 124 U.S.App. D.C. 83, 361 F.2d 537, 542 (1966). We approve." 405 F.2d at 382.

More importantly, in a case decided on December 6, 1972, the United States Supreme Court, in the fifth case to come before it involving alleged suggestive identification procedure, reviewed its prior decisions in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Foster v. California, 394 U.S. 440, 442, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); and Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970), and found to be clearly erroneous the district court's conclusion that the confrontation violated due process. Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401. In the *Biggers* case, the court recited the facts with regard to the attack as follows:

"A. [H]e grabbed me from behind, and grappled—twisted me on the floor. Threw me down on the floor.

"Q. And there was no light in that kitchen?

"A. Not in the kitchen.

"Q. So you couldn't have seen him then?

"A. Yes, I could see him, when I looked up in his face.

"Q. In the dark?

"A. He was right in the doorway—it was enough light from the bedroom shining through. Yes, I could see who he was.

"Q. You could see? No light? And you could see him and know him then?

"A. Yes." Tr. of Rec., pp. 33–34.

Id. at 193, 93 S.Ct. at 379.

After this occurred, the victim was walked at knife-point along the railroad tracks, taken into the woods and raped there. There was no light during this assault other than moonlight. The whole incident took between fifteen minutes and a half hour. Subsequently, the police tried to arrange a line-up, but were unsuccessful in finding subjects at the City Jail or the City Juvenile Home who could answer the general description given by the victim. Instead they conducted a one-on-one show-up, which consisted of two detectives walking the respondent past the victim and having him repeat certain words.

In the *Biggers* case, the district court, in finding that the show-up denied the defendant due process, stated:

"[T]here is no indication that a truly concerted effort was made to produce suitable subjects for a line-up. Aside from a phone call to the juvenile home and a screening of Metro Jail inmates no other efforts were made. There are several other prison facilities in the area and there is no evidence that any effort was made to screen them for subjects. The Court sees no reason why this could not have been done in order to maximize the fairness of the identification process. Here, there was no evidence of any deathbed urgency as in *Stovall* which would have precluded the police from delaying the identification procedure until a suitable line-up could have been arranged. The crime was seven months old, the victim was fully recovered and well, and there are no other indica-

tions that the ends of justice demanded an immediate show-up rather than a much more reliable line-up. Furthermore, none of the other circumstances which the above discussed cases indicate may justify a show-up existed in the instant case. The evidence clearly shows that the complaining witness did not get an opportunity to obtain a good view of the suspect during the commission of the crime. Also, the show-up confrontation was not conducted near the time of the alleged crime, but, rather, some seven months after its commission. Finally the witness in the instant case was unable to give either an independent photographic identification of the suspect or a good physical description of her assailant." Neil v. Biggers, 448 F.2d 91, 94 (6th Cir. 1971).

The Court of Appeals for the Sixth Circuit also reviewed the state trial and the appellate court records and the transcript of the habeas corpus hearing and ruled that the conclusions of fact of the District Judge were not clearly erroneous, and that he had properly applied the principles of due process of law as they applied to identification proceedings at the time of his decision.

However, Justice Powell, for the Supreme Court overturned the findings of both courts below, stating:

"We find that the District Court's conclusions on the critical facts are unsupported by the record and clearly erroneous. The victim spent a considerable period of time with her assailant, up to half an hour. She was with him under adequate artificial light in her house and under a full moon outdoors, and at least twice, once in the house and later in the woods, faced him directly and intimately. She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes. Her description to the police, which included the assailant's approximate age, height, weight, complexion, skin texture, build, and voice, might not have satisfied Proust but was more than ordi-

narily thorough. She had 'no doubt' that respondent was the person who raped her. In the nature of the crime, there are rarely witnesses to a rape other than the victim, who often has a limited opportunity of observation. The victim here, a practical nurse by profession, had an unusual opportunity to observe and identify her assailant. She testified at the habeas corpus hearing that there was something about his face 'I don't think I could ever forget.' Pet. App., p. 128." 409 U.S. at 201, 93 S.Ct. at 382.

Weighing all the factors in the case, the majority of the Supreme Court concluded that there was no substantial likelihood of misidentification. The Court indicated that the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. These factors are very similar to those applied for this court by Judge Craven in upholding the one-on-one confrontation in United States v. Levi, *supra*. In *Levi*, Judge Craven stated for the Court:

"In deciding whether to permit a criminal case to go to the jury, where identification rests upon the testimony of one witness, the district judge ought to consider with respect to identification testimony the lapse of time between the occurrence of the crime and the first confrontation, the opportunity during the crime to identify as compared with the opportunity of other witnesses who may be unable to do so, the reasons, if any, for failure to conduct a line-up or use similar techniques short of line-up, and the district judge's own appraisal of the capacity of the identifying witness to observe and remember facial and other features. In short, the district

judge should concern himself as to whether the totality of circumstances 'give[s] rise to a very substantial likelihood of irreparable misidentification.'" Id., 405 F.2d at 383.

The present case actually is stronger for the admission of the evidence than Neil v. Biggers. For a confrontation to deny due process, it must have been *unnecessarily* suggestive. Here there was clearly more justification for the procedure used than existed in *Biggers*. It is a fair inference in the *Biggers* case, the attack having taken place in Nashville, Tennessee, that there was a more adequate opportunity to obtain subjects for a line-up than there would be in Franklin, West Virginia. In the 1970 Census, the population of Nashville was 447,877, and the population of Franklin was 695. In *Biggers,* the police asked the victim to come to the station house to "look at a suspect." She viewed the defendant there in the custody of five police officers. In the present case, the victim viewed Smith in the custody of two officers in the quiet of a doctor's office. Unlike the situation in *Biggers,* in the present case there was no seven-months delay between the occurrence of the nighttime sexual attack and the one-on-one confrontation. Instead, there was but a three-hour delay. Additionally, the District Court mentioned in footnote 1 of its opinion, as quoted by the Sixth Circuit in *Biggers,* that there was considerable doubt on reading the trial record as to whether the victim in that case, Mrs. Beamer, made a positive in-court identification of the defendant at the time of his trial. In the present case, the victim did make a positive in-court identification of the defendant.

Unquestionably, in the present case there are elements of the testimony which might affect the weight to be given to the identification made by Mrs. Hammer. It is true she had been treated for about two years for cataracts. It is true that she did wear glasses. She simply stated she can see without glasses but can see better with them. The fact that she left her glasses downstairs

in the house when she retired would indicate that she was able to get ready to retire without the need of using her glasses. She does claim that she studied the features of the man. She told her son that her attacker was slender and a long-faced person. She indicated at the trial when asked "Question: Do you know of your own personal knowledge how old the defendant here is? Answer: My statement says 26 or 27." Actually the defendant was 26. All of these elements bear on the accuracy of her identification which the jury should be allowed to consider.

It seems to the undersigned that the West Virginia trial judge took the appropriate action in the present case when, at the close of all the evidence, he considered the motion of defense counsel for a verdict of acquittal. The sole basis urged on the motion was the unsatisfactory nature of the identification testimony of the victim. The trial judge stated:

"The Jury has a right to take into consideration not only the indentification of which you spoke but the Jury has a right to connect that, if it can, with the fact that he was found in the home by the officers. However, the Jury will further have the right to consider the view or the statement of the defendant in regard to how he got there. It is true that Mrs. Hammer had about nine o'clock made an statement to Dr. Eye concerning the identification of the person and vaguely described that to the Doctor. The Jury will have that also to consider and the Court is of the opinion that it is a Jury question, a question of fact and not a question of law and therefore the Court will overrule your motion for directed verdict."

In the present case, I think the Supreme Court would reach the same conclusion it reached in Neil v. Biggers, namely:

"The evidence was properly allowed to go to the jury."

I would affirm.