**UNITED STATES of America ex rel. Lorenzo RICHARDSON**

v.

**A. T. RUNDLE, Superintendent.**

**Civ. A. No. 70–46.**

United States District Court, E. D. Pennsylvania.

Aug. 2, 1974.

Joseph A. Torregrossa, Philadelphia, Pa., for relator.

Bonnie B. Leadbetter, Asst. Dist. Atty., Philadelphia, Pa., for respondent.

## OPINION

LUONGO, District Judge.

In 1965, Lorenzo Richardson (relator) was convicted in state court on a charge [1] of aggravated robbery and sen-

1. No. 382, Court of Quarter Sessions, March Sessions, 1963, County of Philadelphia. He was also convicted on charges of assault and battery, conspiracy and carrying a concealed deadly weapon, Nos. 381, 384 and 385. Sentence was suspended on those charges.

tenced to a term of 7½ to 15 years. Following unsuccessful state appeals and a denial by the United States Supreme Court of a writ of certiorari, Richardson petitioned this court for a writ of habeas corpus. On April 5, 1971, I granted the writ on the ground that a holster and cartridge admitted in evidence at Richardson's trial were obtained as the result of an unlawful frisk. U. S. ex rel. Richardson v. Rundle, 325 F.Supp. 1262 (E.D.Pa.1971). Richardson had also contended that his constitutional rights were violated by the circumstances under which he was identified by the victim of the robbery. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Because relator had not exhausted state court remedies on the identification issue, I declined to reach it. On June 8, 1972, the Court of Appeals reversed the grant of the writ of habeas corpus, holding that the frisk was lawful and remanded the matter to this court to consider whether the identification procedure violated due process.[2] 461 F.2d 860 (3d Cir. 1972).

The facts surrounding the challenged identification were adduced at relator's state court trials.[3] The record was supplemented only minimally by a habeas hearing held on June 25, 1974.

On the evening of February 18, 1963, Louis Lipschultz was alone in his drugstore at 1500 West Tioga Street, Phila- delphia. At approximately 9:45 p. m., as Lipschultz was about to close the store, two men came in. One of the men had on sunglasses, but their faces were otherwise uncovered. Lipschultz was standing behind the counter approximately 20 to 25 feet from the door where the robbers entered. The two men walked directly toward him. The man without sunglasses pulled a gun and told Lipschultz, "This is a hold-up. Stick 'em up." The man with sunglasses walked to the cash register and tried to open it. Lipschultz turned toward him and shoved him. At that moment, the gunman, who had stepped behind Lipschultz when he turned toward the cash register, struck him on the head and knocked him unconscious. Before Lipschultz regained consciousness, the robbers fled the drugstore.

At about this time,[4] Police Officers John Penko and Ralph Meehan were cruising in a patrol wagon in an easterly direction on Tioga Street in Philadelphia. Having been informed by their superiors of a recent rash of robberies of drugstores by teenage gangs in the area, they were enroute to checking out the Lipschultz drugstore at closing time. About a half block from their destination, the officers observed four black male teenagers, all wearing irridescent raincoats and pork pie hats, running from the steps of the drugstore in the di-

---

2. The Court of Appeals noted that ordinarily, because the relator had not exhausted state remedies with regard to the identification issue, he would be left to pursue further relief under the Pennsylvania Post-Conviction Hearing Act. However, the Court of Appeals concluded that since this court had taken jurisdiction of the case and had interrupted relator's period of custody, "there are exceptional circumstances in this case which warrant the relaxation of the rule of comity laid down in 28 U.S.C. § 2254(b). United States ex rel. Gockley v. Myers, 411 F.2d 216 (3d Cir.), cert. denied, 396 U.S. 847 [90 S.Ct. 96, 24 L.Ed.2d 96] (1969)." 461 F.2d at 864–865.

The mandate from the Court of Appeals issued June 8, 1972. The hearing was not held until June 25, 1974. The delay was attributable in part to relator's unsuccessful attempt to obtain a writ of certiorari to the Supreme Court, and in part to a request from relator, joined in by the state prosecutor, to afford the parties the opportunity to seek alternative solutions to relator's claims of violation of constitutional rights. The matter was scheduled for hearing promptly after the court was advised that no feasible alternative solutions were available. Relator has, meanwhile, without objection from the state prosecutor, remained at large on bail pending the outcome of this hearing.

3. Richardson's first trial, in November 1964, resulted in a hung jury and a mistrial. He was convicted at his second trial in June 1965.

4. This paragraph of the statement of facts can be found in my first opinion in this case, 325 F.Supp. at 1263, and is repeated here virtually verbatim.

rection of the police wagon. The boys ran past the police vehicle, turned south onto Sydenham Street at the next corner and then turned into an alley leading toward 15th Street. The police became suspicious and gave chase, but lost the boys when they turned into the alley. The officers proceeded to the next block (Ontario Street) where they observed a group of black youths on the corner of 15th and Ontario wearing the same type clothing as those observed running from the drugstore. At the approach of the patrol vehicle, three of the youths ran south on 15th Street. They were pursued by Officer Penko in the patrol wagon. Meanwhile, Officer Meehan, who had alighted from the vehicle, seized the fourth, Richardson, who had started to walk west on Ontario Street. Meehan escorted Richardson toward the patrol wagon. He frisked Richardson and found an empty leather holster and a .22 caliber bullet in his pants pocket. A moment later, Jacqueline Gaines, who had witnessed the chase, walked up and handed Officer Meehan a .25 caliber pistol which she stated one of the youths had dropped at the corner of 15th and Ontario. At this point, Meehan placed Richardson in the patrol wagon.

The officers then proceeded to the drugstore. Mr. Lipschultz had just regained consciousness from the blow on the head, and he was applying ice to his wound. The police asked if anything had happened there and Lipschultz said that he had been held up. Officer Meehan responded, "Well, come out here. I think we got the man." Upon reaching the police wagon, the officers told Richardson to slide forward to that Lipschultz could see him. Richardson stuck his head out of the back of the wagon, and Lipschultz identified him as one of the men who had robbed him. There was a light in the front of the wagon but it provided no illumination at the rear. Richardson was not asked to step

out of the wagon. Lipschultz had not provided the police with any description of the robbers before viewing and identifying Richardson as one of the men who robbed him. Later that evening at the police station, Lipschultz again confronted Richardson singly (not in a line-up) and again identified him as one of the men who had robbed him. At this time, he had the opportunity to view relator fully. Lipschultz was shown another suspect at the police station, but he did not identify him as one of the two men who had been in his store.

On these facts, relator argues that the confrontation at the police wagon was so inherently "suggestive" that the admission into evidence of that identification violated due process. He argues further that Lipschultz' later identifications, at the police station and at trial, were irreparably tainted by the first unlawful showup.

█ The standard for determining whether the confrontation between Lipschultz and relator violated due process is furnished by a series of Supreme Court cases, of which Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1973), is the most recent and comprehensive.[5] The Court, speaking through Justice Powell, made it clear that while "suggestive confrontations are disapproved," and "unduly suggestive ones are condemned," 409 U.S. 198, 93 S.Ct. 375, 34 L.Ed.2d 401, suggestiveness alone does not require the exclusion of the resulting out-of-court identification. The crucial question is whether based on a totality of the circumstances, there "is a very substantial likelihood of . . . misidentification." *Biggers, supra*, at 198, 93 S.Ct. at 381. The main focus is on the reliability of the out-of-court identification, rather than the suggestiveness of the confrontation, and "the factors to be considered in evaluating the likelihood of misidentification

5. See also, Stovall v. Denno, supra; Simmons v. United States, 390 U.S. 377, 88 S. Ct. 967, 19 L.Ed.2d 1247 (1968); Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970).

include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." 409 U.S. at 199–200, 93 S.Ct. at 382.

■ Of these indicia of reliability spelled out by the Supreme Court in *Biggers*, the amount of time elapsing between crime and confrontation assumes great importance. In the instant case, the challenged showup occurred within minutes after the robbery. The lower courts have been virtually unanimous in approving prompt, on-the-scene showups "despite inevitable elements of suggestivity, because of the general reliability of identifications close in time to the offense." [6] The Court of Appeals for the District of Columbia has most persuasively explained the reasons for viewing such showups as an exception to the general rule that a witness should not confront a suspect singly. As Judge (now Chief Justice) Burger wrote for the panel in Bates v. United States, 132 U.S.App.D.C. 36, 405 F.2d 1104, 1106 (1968):

> "There is no prohibition against a viewing of a suspect alone in what is called a 'one-man showup' when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification but rather tends under some circum-

stances to insure accuracy. The rationale underlying this is in some respects not unlike that which the law relies on to make an exception to the hearsay rule, allowing spontaneous utterances a standing which they would not be given if uttered at a later point in time. An early identification is not error . . . . ' Prudent police work would confine these on-the-spot identifications to situations in which possible doubts as to identification needed to be resolved promptly; absent such need the conventional lineup viewing is the appropriate procedure."

Chief Judge Bazelon elaborated in Russell v. United States, 133 U.S.App.D.C. 77, 408 F.2d 1280, 1284 (1969):

> "[R]ecognition of a person or face would seem to be as much the product of a subjective mental image as of articulable, consciously remembered characteristics. A man may see clearly in his 'mind's eye' a face or a figure which he is hard put to describe adequately in words. Though the image of an 'unforgettable face' may occasionally linger without any translation into words, photographic recall is most often ephemeral. Vivid in the flash of direct observation, it fades rapidly with time. And the conscious attempt to separate the ensemble impression into particular verbalized features, in order to preserve some recollection, may well distort the original accurate image so that it is the verbalized characteristics which

---

**6.** See, e. g., United States v. Crawford, 156 U.S.App.D.C. 1, 478 F.2d 670 (1973); United States v. Gaines, 450 F.2d 186 (3d Cir. 1971); United States v. Lee, 158 U.S.App. D.C. 296, 485 F.2d 1075 (1973); Russell v. United States, 133 U.S.App.D.C. 77, 408 F. 2d 1280 (1969); Bates v. United States, 132 U.S.App.D.C. 36, 405 F.2d 1104 (1968); United States ex rel. Gomes v. New Jersey, 464 F.2d 686 (3d Cir. 1972); Mock v. Ross, 472 F.2d 619 (6th Cir. 1972); Stanley v. Cox, 486 F.2d 48 (4th Cir. 1973), and cases cited therein at 51, n. 9.

The Supreme Court has not spoken definitively about showups staged immediately aft-

er the crime. This causes me no pause. In the absence of a Supreme Court ruling, I am bound by the Third Circuit's approval of on-the-scene showups (*Gomes; Gaines*) and I am impressed by similar approval in the other circuits. Moreover, the Supreme Court's *Biggers* opinion notes twice that the amount of time elapsing between the crime and the showup is a significant factor to be considered, 409 U.S. at 199–200 and 201, 93 S.Ct. 375, 34 L.Ed.2d 401, satisfying me that the Court would, if confronted with the issue, align itself with the lower courts in generally approving immediate, on-the-scene confrontations.

are remembered and not the face or the man.

Balancing all the doubts left by the mysteries of human perception and recognition, it appears that prompt confrontations in circumstances like those of this case will 'if anything promote fairness, by assuring reliability' . . . . "

For these reasons, "absent special considerations of unfairness, prompt on-the-scene confrontations do not entail due process violations." *Russell, supra,* 408 F.2d at 1284.

■ That the showup in which Lipschultz first identified Richardson was suggestive goes practically without saying. Police Officer Meehan brought the victim of the robbery to observe a single suspect, who was locked up in a police wagon. "Such singling out, or indicating to the witness that the man in custody is the man the police believe to have committed the crime is a classic example of . . . suggestiveness." *Rudd v. State of Florida,* 477 F.2d 805, 809 (5th Cir. 1973). However, the "special considerations of unfairness" referred to in *Russell* are not present here. Officer Meehan's statement that "I think we've got the man" would, at first blush, appear to make the confrontation unduly suggestive, but as the District of Columbia Court of Appeals has pointed out, "[w]hatever the police actually say to the viewer, it must be apparent to him that they think they have caught the villain. Doubtless a man seen in handcuffs or through the grill of a police wagon looks more like a crook than the same man standing at ease and at liberty." *Russell, supra,* 408 F.2d at 1284; United States v. Thurman, 135 U.S. App.D.C. 184, 436 F.2d 280, 283 (1970). The court's well-taken point is that a showup is by its very nature suggestive, and the police officer's words ordinarily will not increase the suggestivity already inherent in the format.

■■ The fact that Lipschultz was struck on the head shortly before he identified Richardson does not alter the result. The effect of Lipschultz' injury on his perception was a fertile area of inquiry for defense counsel and a natural area of concern for the fact finder, but it does not render evidence of the identification inadmissible as a matter of law. Undoubtedly, many showups have featured witnesses whose reliability could be challenged because of excitement, hysteria or injury at the time of confrontation, but relator has cited no case challenging the principle that "proof of infirmities and subjective factors, such as hysteria of a witness, can be explored on cross-examination and in argument." *Bates, supra,* 405 F.2d at 1106; cf. United States v. Lee, 158 U.S. App.D.C. 296, 485 F.2d 1075 (1973) (conviction based in part on showup identification upheld although the witness was "excited and in a state of shock.") Similarly, the adequacy or inadequacy of the lighting in the police wagon, and the fact that Lipschultz viewed only relator's face, are also issues for the fact finder.

The instant case bears no resemblance to Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969), the only case in which the Supreme Court concluded that the challenged identification procedure was so impermissibly suggestive as to create a substantial likelihood of misidentification. In that case, despite a suggestive initial lineup, the witness failed to identify Foster. The police then held a "showup," at which the witness was still unable to make a positive identification. It was not until a third confrontation, at a lineup in which Foster was the only person who had also been in the initial lineup, that the witness was able to make a definite identification. The Court held the identification evidence inadmissible, because identification of Foster was "all but inevitable" under the circumstances. 394 U.S. at 443, 89 S.Ct. 1127, 22 L.Ed.2d 402. Here, in contrast, Lipschultz' identification of Richardson at the showup was immediate and unequivocal, enhancing its reliability and reducing the possibility that the identification was the

result of impermissible police suggestion. See Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); Neil v. Biggers, *supra*.

When the other factors which the *Biggers* court used to test reliability are considered, the conclusion that there was no substantial likelihood of misidentification is strengthened. Quite obviously, a showup which occurs immediately after the crime is conducive to a reliable identification only if "the opportunity of the witness to view the criminal at the time of the crime [and] the witness' degree of attention" (*Biggers, supra*, 409 U.S. at 199, 93 S.Ct. at 382) are adequate. Lipschultz' opportunity to observe the robbers and his degree of attentiveness were ample, from a due process standpoint, to support a reliable identification. Although his attention was divided between the faces of two men and the gun ("I kept staring at the gun"), he did observe the men when they entered the store and he watched them walk the length of the store directly toward him. Because the drugstore was still open for business, the lighting was adequate. Except for the sunglasses on one, nothing covered any part of the faces of the two men. Admittedly, Lipschultz' attention was diverted; once the men came around the counter, he focused on the man at the cash register, and the gunman, whom he ultimately identified as Richardson, was standing behind him out of sight. Accepting Lipschultz' narrative of what transpired, although a fact finder might question his estimate that the robbers were in the store for as much as four minutes, nevertheless Lipschultz' vantage point compares favorably, in duration, proximity and lighting to the opportunities of witnesses to observe in other cases where the identifications were upheld as reliable. Compare, e. g. Souza v. Howard, 488 F.2d 426 (1st Cir. 1973); Russell v. United States, *supra*; United States ex rel. Springle v. Follette, 435 F.2d 1380 (2d Cir. 1970). Moreover, Lipschultz' opportunity to observe the robbers was infinitely greater than that of the witness in Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). In that case, although the victim, Reynolds, (who had been shot twice) said he "got a real good look" at his assailant, he actually caught only a fast glimpse of him "in the car lights." Notwithstanding the limited opportunity for observation, the Supreme Court held that the trial court could have found "that Reynolds' identifications were entirely based upon observations at the time of the assault and not at all induced by the conduct of the lineup." 399 U.S. at 5–6, 90 S.Ct. at 2001.

One other factor merits passing mention. The Supreme Court in *Biggers* cited "the accuracy of the witness' prior description" *(Biggers, supra*, 409 U.S. at 200, 93 S.Ct. at 382) as one of the yardsticks of reliability. The fact that a person identified by a witness conforms to a prior independent description given by the witness carries with it some mark of reliability; the more detailed the description, the more reliable the identification is likely to be. Conversely, if the physical appearance of the person identified by the witness differs markedly from a prior description, it obviously undercuts the reliability of the identification. Such a conflict would at the very least be of great weight to a fact finder; in conjunction with other circumstances tending to establish a substantial possibility of misidentification, it could prompt the court to conclude that the identification was unacceptable as a matter of law. See Smith v. Coiner, 473 F.2d 877 (4th Cir. 1973). Prior descriptions of suspects are more apt to be crucial factors in cases such as *Biggers* where substantial time has elapsed between the crime and the confrontation. See, e. g. Souza v. Howard, 488 F.2d 462, 466 (1st Cir. 1973). In the instant case, the police failed to elicit any description of the robbers from Lipschultz before the showup of Richardson. This omission is common where a showup is held on the scene immediately after the crime. See, e. g. United States ex rel. Gomes v.

State of New Jersey, 464 F.2d 686 (3d Cir. 1972); United States ex rel. Springle v. Follette, 435 F.2d 1380 (2d Cir. 1970); United States v. Lee, *supra.* The absence of description serves neither to confirm nor refute the witness' identification, leaving the decision on reliability to rest on other factors in the case.[7]

A review of the cases relied on by relator satisfies me that all are distinguishable from Richardson's case. In Smith v. Coiner, *supra,* the challenged showup took place five hours after the alleged rape and "there [was] no suggestion that the identification . . . was part of an on-the-scene immediate investigation." 473 F.2d at 881. Under those circumstances, the court found no reason justifying a showup, rather than a lineup. Additionally, the 72 year old prosecutrix, afflicted with a cataract condition, caught only a two second look at her assailant in the beam of a flashlight, and she was not wearing her glasses at the time. She also stated at one point that her assailant resembled a 50 year old neighbor, whereas the person whom she identified as the assailant at the showup was a man in his twenties.

In United States ex rel. Barnwell v. Rundle, 337 F.Supp. 688 (E.D.Pa.1972), six men entered the apartment of Leroy Mills, tied his hands behind his back and forced him to lie face down on the bathroom floor. At the same time, in another room, five men had sexual relations with a Mrs. Holmes, who had been in the apartment with Mills. Unlike Smith v. Coiner, Barnwell did involve a prompt, on-the-scene (actually at the nearby police station) showup. Chief Judge Lord nevertheless found the out of court identification to be violative of due process. Mills identified Barnwell at the showup[8] as one of the assailants, but he made the identification only on the basis of voice and clothing because he did not get a good look at the men while lying bound on the floor. Moreover, the identification procedure in *Barnwell* was marred by special considerations of unfairness not present in the instant case. While Mills and Mrs. Holmes waited in an interrogation room, the police searched Barnwell and found a scarf in his pocket. They showed it to Mrs. Holmes who, in the presence of Mills, positively identified the scarf as hers. The police officer then said "I have the man with the scarf" and took Mills and Mrs. Holmes in to see Barnwell. The identification by Mills followed shortly thereafter. The disclosure about the scarf, just prior to the confrontation, was a powerful piece of impermissible suggestion, quite above and beyond the suggestiveness inherent in the showup itself, and it has no equivalent in Richardson's case.

Finally, relator relies on Rudd v. State of Florida, *supra. Rudd* did not involve an on-the-scene confrontation occurring immediately after the crime. Equally important, in determining whether testimony concerning the showup identification should have been admitted into evidence, the Court of Appeals focused only on the suggestiveness of the confrontation.[9] This emphasis is understanda-

---

7. One factor which cuts in favor of Lipschultz' identification, but with minimal weight, is the fact that when confronted with a second suspect at the police station, he refused to identify the man as the second robber. Like the issue of prior description, this factor sometimes assumes real significance when considerable time has elapsed between the crime and the confrontation. If, as in Neil v. Biggers, supra, or Souza v. Howard, supra, the witness has had other opportunities to view suspects and has refused to identify them, when he does identify a suspect, his opinion is more likely to be judged reliable because of his prior refusals.

8. Mills made no in-court identification. Mrs. Holmes made neither in-court nor out of court identifications.

9. The *Rudd* opinion states:

    "By inviting the witness to view the suspect as he sat alone in the state attorney's office besides one or two police officers, the police in effect suggested that 'this is the man.'

    Such singling out, or indicating to the witness that the man in custody is the man the police believe to have committed the crime, is a classic example of impermissible suggestiveness." 477 F.2d at 809 (citations omitted)

ble; *Rudd* (as did *Barnwell*) preceded Neil v. Biggers, and as the Supreme Court recognized, until *Biggers* it was unclear whether "unnecessary suggestiveness alone require[d] the exclusion of evidence." *Biggers, supra,* 409 U.S. at 199, 93 S.Ct. at 382, *Biggers* established, of course, that the reliability of the identification, not the suggestiveness of the confrontation, is decisive. The *Rudd* court made no attempt to review the factors which the Supreme Court indicated were crucial in ascertaining whether an identification was reliable, consequently, *Rudd* furnishes little persuasive support for Richardson.

I conclude that the prompt, on-the-scene showup was not impermissibly suggestive, and the admission in evidence of the identification by Lipschultz did not violate Richardson's due process rights. The petition for writ of habeas corpus will be denied.