## SHERMAN WOODROW DOBSON *v.* STATE OF MARYLAND

[No. 490, September Term, 1974.]

*Decided February 20, 1975.*

The cause was argued before THOMPSON, GILBERT and MOORE, JJ.

*Arnold M. Zerwitz* and *Elsbeth Levy Bothe, Assistant Public Defenders,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Sandra A. O'Connor, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

Sherman Woodrow Dobson, appellant, was indicted by the Grand Jury of Baltimore City for a multitude of criminal offenses including the murder of James A. "Turk" Scott. Dobson was convicted, however, in the Criminal Court of Baltimore by a jury of only kidnapping, robbery with a deadly weapon, receiving stolen goods and the use of a handgun in the commission of a crime of violence. Dobson received sentences aggregating fifteen years. Lamenting his

convictions, Dobson has appealed to this Court where he asks:

> "1. Whether [his] convictions should be reversed since the pre-trial identification procedures were so impermissibly suggestive as to make irreparable misidentification a near certainty and deny [him] due process of law?
>
> 2. Whether the trial judge abused his discretion by allowing the rebuttal testimony of Carl Sylvester Washington?"

Prior to trial Dobson, through his counsel, filed a motion to suppress an in-court identification of the traverser on the ground that the identification was predicated upon an impermissibly suggestive photographic identification procedure. The motion was directed at the identification that the State expected to be made at trial by Stephen Allen Brown, an associate minister of the Manor Bible Baptist Church, manager of the "Grace Memorial Hour", and part-time cab driver.

On June 18, 1972, Brown, while operating his taxicab, picked up two passengers at Liberty Heights Ave. and Garrison Blvd. When the passengers entered the cab they asked to be taken to Wabash and Edgewood Avenue. When they had arrived at that destination one of the passengers, later identified as Dobson, put a gun into Brown's side. The second passenger, who was seated on the rear seat of the cab, placed a gun to the back of Brown's head and the duo of holdup men were joined by a third person. Brown was removed from the driver's seat and placed on the rear seat of the cab. Dobson drove the cab to a wooded area near the Lemmel Junior High School. Once there the trio of culprits accompanied Brown into the wooded area. Brown was handcuffed to a tree. Dobson remained with Brown and the other two exited the area. Brown remained in Dobson's company for a period of two and one-half to three hours during which time he had the opportunity to observe Dobson, although Brown stated that he avoided staring directly at Dobson for fear that if he did so he might be

killed. According to Brown the wooded area was near a railroad track and there was a light about fifty yards away. He knew that his assailant was wearing glasses, was brown skinned, and he was also able to determine that his abductor had a "funny-shaped nose." When the other two men returned to the wooded area Brown observed that one of them had a submachine gun. Brown was released by the trio, found his way out of the woods and ultimately called the police. The description that he furnished the police was vague. Shortly after the robbery he was shown some photographs from which he was unable to pick any of his abductors. Brown candidly admitted that he could not recognize two of the three kidnappers. On July 14, 1973 Brown was shown a series of fifteen additional photographs from which he picked the photograph of the appellant, Sherman Dobson. Brown stated that that photograph depicted the person who put the gun in his side and who spent the two and one-half to three hours with him in the wooded area. Of the fifteen photographs submitted to Brown, only one individual is shown to be wearing glasses and that is the appellant. Dobson's lawyers, for three days of pretrial hearing,[1] valiantly and vigorously sought to discredit Brown and to demonstrate that the photographic identification was so impermissibly suggestive that it should be excluded. At the conclusion of the hearing the trial judge stated that during the course of the pretrial hearing he had borne in mind the test enunciated in *Simmons v. United States*, 390 U. S. 377, 88 S. Ct. 967, 19 L.Ed.2d 1247 (1968), and *Smith v. State*, 6 Md. App. 59, 250 A. 2d 285 (1969), *cert. denied*, 397 U. S. 1057, 90 S. Ct. 1402, 25 L.Ed.2d 674 (1970), as to whether "the confrontation procedures [were] so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." The judge stated that he was "also mindful of the fact that [he] must take into consideration the totality of the confrontation and . . . the totality of the circumstances [are] significant." The trial judge observed that Mr. Brown did spend considerable time

---

1. By prearrangement Dobson was not present in the courtroom during the pretrial hearing. He waived, in writing, his right to be present for obvious tactical reasons.

in the woods with Dobson and that the judge had regarded Brown's "demeanor and manner very carefully." He interpreted Brown's testimony as being "very honest" and that Brown was a "sincere individual" who really did not want to get involved. The judge went on to state:

> "[Brown] said, 'I paid very little attention to the first man, and the second man I couldn't see at all,' which gives me some belief that this was a very truthful witness and that he was not trying to either get in the limelight or to falsely accuse anyone. But he said, 'I saw the number one man as he got in. He wore glasses, he had a funny-shaped nose, and I got a glance at him, and I estimate his weight,' . . . he said 'a little heavier than me, and I run one hundred and sixty-five, so I would say he is around one hundred and seventy, and he was in his early twenties,' and that convinces me he got a rather substantial look at him, and a little more than the defense argued. He also said later on he was brown-skinned. Then he brought out later that his shoes were tan, brown pants, and I gather from that that a lot of evidence had to be drawn out of this witness.

> Over and apart from this it is uncontradicted that [Brown] was in the woods with [Dobson] some two to three hours; he said they talked, talked about prayer. [Brown] wasn't comfortable so [Dobson] went and got something to make him comfortable, and what have you. I also note . . . that [Brown] said at one time that looking back, he was able to get some description. He said, now that 'I've thought about it awhile and looking back and reflecting my thoughts of the past occasion,' [Brown] gave his testimony. He said he didn't want to jeopardize his life by being able to identify anybody, which I interpret to mean he wasn't staring and looking for features and say[ing to himself], 'now, when I get out of here, I'm going to really nail this guy.' I think he was saying, 'I didn't

stare at him to get the guy so that I'd be able to identify him later on.' For that reason, I don't interpret that to mean that he got no look at him, because he was in the woods all this time, and I've considered all this talk that he mentioned, which is part of the record, that he did get a look at him."

Dobson's first attack upon the judgment of the Criminal Court is focused on the pretrial motion to suppress the in-court identification. Consequently, we are limited in our review to the evidence produced at such a hearing, because it was on that particular evidence, and that evidence alone, that the trial judge made his determination to deny the pretrial motion to suppress the identification.[2]

Most attacks in this Court upon convictions grounded on possibly tainted photographic identification have been unsuccessful. See *Sallie v. State*, 24 Md. App. 468, 332 A. 2d 316 (1975); *Jordan v. State*, 19 Md. App. 283, 310 A. 2d 575 (1973); *Cousins v. State*, 18 Md. App. 552, 308 A. 2d 692 (1973), *cert. denied*, 270 Md. 738 (1973); *Conway v. State*, 15 Md. App. 198, 289 A. 2d 862 (1972), *cert. denied*, 266 Md. 735 (1972), *cert. denied*, 413 U. S. 920, 93 S. Ct. 3070, 37 L.Ed.2d 1042 (1973); *Crenshaw v. State*, 13 Md. App. 361, 283 A. 2d 423 (1971), *cert. denied*, 264 Md. 746 (1972); *Jackson v. State*, 13 Md. App. 31, 280 A. 2d 914 (1971); *Jones v. State*, 10 Md. App. 420, 270 A. 2d 827 (1970), *cert. denied*, 260 Md. 721 (1971); *Dorsey v. State*, 9 Md. App. 80, 262 A. 2d 591 (1970), *cert. denied*, 258 Md. 727 (1970); *Mouzon v. State*, 9 Md. App. 57, 262 A. 2d 588 (1970), *cert. denied*, 258 Md. 729 (1970); *Joyner v. State*, 7 Md. App. 692, 257 A. 2d 444 (1969), *cert. denied*, 257 Md. 734 (1970); *Bailey v. State*, 6 Md. App. 496, 252 A. 2d 85 (1969), *cert. denied*, 255 Md. 739 (1969). *But see Perkins v. State*, 11 Md. App. 527, 275 A. 2d 517 (1971) wherein the *Smith v. State* procedures were not followed. Dobson asserts, however, that none of the cases that we

---

2. The appellant has interwoven in his argument various references to conflicts between the evidence produced at the pretrial hearing with that produced during the course of the trial itself. The pretrial hearing involved a question of law for the judge. The trial evidence was for the trier of fact, in this case, the jury.

have heretofore considered have been so egregious as the case presently before us.

Photographic identification procedures are usually employed by the police in three separate, but not necessarily exclusive, phases of a case: the investigation phase, the in-custody phase and the charge-on-defendant phase. N. Sobel, *Eye Witness Identification: Legal and Practical Problems* § 45 (1972). Courts, as a general rule, have upheld the constitutionality of photographic identification at the investigation stage. N. Sobel, *supra* § 45.01. *See e.g. United States v. Benson*, 495 F. 2d 475 (5th Cir. 1974); *United States v. Kirby*, 427 F. 2d 610 (D.C. Cir. 1970); *United States v. Hamilton*, 420 F. 2d 1292 (D.C. Cir. 1969); *United States v. Butler*, 405 F. 2d 395 (4th Cir. 1968), *cert. denied*, 396 U. S. 853, 90 S. Ct. 114, 24 L.Ed.2d 102 (1969); *United States v. Strouse*, 375 F. Supp. 672 (D.C. Pa. 1973); *People v. Anderson*, 389 Mich. 155, 205 N.W.2d 461 (1973); *State v. Nettles*, 81 Wash. 2d 205, 500 P. 2d 752 (1972); *State v. Royster*, 57 N. J. 472, 273 A. 2d 574 (1971), *cert. denied*, 404 U. S. 910, 92 S. Ct. 235, 30 L.Ed.2d 182 (1971).

In the instant case it is the use of photographs in the investigation phase that is assailed by the appellant.[3] Dobson does not assert that it is impermissible to use photographs, but rather that the method used here was constitutionally impermissible. The Supreme Court has considered the question of photographic identification in only two cases, *viz., Simmons v. United States, supra,* and *United States v. Ash*, 413 U. S. 300, 93 S. Ct. 2568, 37 L.Ed.2d 619 (1973), with the latter turning on a refusal by the Court to extend the Sixth Amendment right to counsel to the photographic identification process. *Ash* did not discuss the due process issue of whether the photographs employed in that particular case were impermissibly suggestive.[4]

The *Simmons* Court sanctioned the use of the

---

3. The record indicates that Dobson was arrested on July 15, 1973 — the day after the last photographic viewing by Brown.

4. For a critique of Ash *see* Grano, *Kirby, Biggers, and Ash: Do Any Constitutional Safeguards Remain Against the Danger of Convicting the Innocent?*, 72 Mich. L. Rev. 717 (1974).

photographic identification technique. Speaking through the late Mr. Justice Harlan, the Court declared:

"Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on the ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

See also *Conway v. State, supra,* and *Crenshaw v. State, supra.* This Court in *Smith v. State, supra,* stated in 6 Md. App. at 67:

"Thus when it is shown that a pretrial identification by photograph, on the totality of the circumstances surrounding it, was so unnecessarily suggestive as to give rise to a very substantial likelihood of irreparable misidentification, the admission of such identification or an in-court identification, as substantive independent evidence of identity, is determined, as when a pretrial confrontation is shown to be illegal by denial of due process of law, pursuant to the exclusionary rules of *Wade* [*United States* v., 388 U. S. 218, 87 S. Ct.

1926, 18 L.Ed.2d 1149 (1967)] and *Gilbert* [*v. California*, 388 U. S. 263, 87 S. Ct. 1951, 18 L.Ed.2d 1178 (1967)]. We note that the rules of this State relating to identification evidence existing prior to *Wade* and *Gilbert* are still effective as qualified by the exclusionary rules enunciated in these opinions." (Footnote omitted).

In *Simmons, supra,* the Court held "that each case must be considered on its own facts." We shall now examine some of the facts that have been considered by the courts and held not to be impermissibly suggestive: Only one photograph depicted a man with gray hair and the suspect had gray hair, *Saville v. United States,* 400 F. 2d 397 (1st Cir. 1968), *cert. denied,* 395 U. S. 980, 89 S. Ct. 2137, 23 L.Ed.2d 768 (1969); a witness was shown three pictures, one each day, until identification was made on the third day, *McClain v. State,* 247 Ark. 33, 444 S.W.2d 99 (1969); a photograph of an accused appeared by itself on a page while the other photographs were mounted two to a page, *Dorsey v. State, supra;* two double pictures of defendant were shown while only one set of pictures of other individuals was included in the photographic array, *Commonwealth v. Geraway,* 355 Mass. 433, 245 N.E.2d 423 (1969), *cert. denied,* 396 U. S. 911, 90 S. Ct. 226, 24 L.Ed.2d 186 (1969); two out of thirteen photographs were of the defendant, and one of the two was unlike any other picture in that it depicted the defendant in a uniform, *United States v. Butler, supra;* only the defendant's photograph was used, *Clemons v. United States,* 408 F. 2d 1230 (D.C. Cir. 1968), *cert. denied,* 394 U. S. 964, 89 S. Ct. 1318, 22 L.Ed.2d 567 (1969) and *State v. Matlack,* 49 N. J. 491, 231 A. 2d 369 (1967), *cert. denied,* 389 U. S. 1009, 88 S. Ct. 572, 19 L.Ed.2d 606 (1967); two photographs were shown, and the witness was asked to pick out the person who committed the crime, *State v. Fullen,* 1 Ariz. App. 466, 404 P. 2d 732 (1965).

*Simmons, supra,* uses the term "impermissibly suggestive" while the term "unnecessarily suggestive" is used by the Court in *Gilbert, Wade* and *Stovall v. Denno,* 388 U. S. 293, 87 S. Ct. 1967, 18 L.Ed.2d 1199 (1967). *Neil v.*

*Biggers,* 409 U. S. 188, 93 S. Ct. 375, 34 L.Ed.2d 401 (1972) uses both terms. As a result of the use of "unnecessarily suggestive" in the confrontation cases and "impermissibly suggestive" in the only photographic identification case, some question has arisen as to whether the two terms have separate and distinct meanings dependent upon the method of identification. The question is partially answered by the Court's use interchangeably of the two terms in *Biggers.* It is further answered in *Foster v. State,* 272 Md. 273, 323 A. 2d 419 (1974) where Judge O'Donnell indicated at 304, n. 15, that "[t]he terms 'unnecessarily suggestive' as used in *Stovall . . .* and 'impermissibly suggestive' used in *Simmons . . .* represent different articulations of the same requirement and should be so applied"; *accord, Stanley v. Cox,* 486 F. 2d 48, 50, n. 5 (4th Cir. 1973). *Cf. United States ex rel. Phipps v. Follette,* 428 F. 2d 912 (2d Cir. 1970), *cert. denied,* 400 U. S. 908, 91 S. Ct. 151, 27 L.Ed.2d 146 (1970). *See also* 73 Colum. L. Rev. 1168, 1171, n. 29 (1973) which states "[t]he tests would appear to have the same meaning — lack of compelling circumstances."

The Supreme Court has fashioned a test upon which lower courts are required to rely in determining whether, under the totality of the circumstances, a photographic identification is "impermissibly suggestive." Mr. Justice Powell in *Neil v. Biggers, supra,* for the majority of the Court,[5] enunciated five factors to be considered "in evaluating the likelihood of misidentification" under the "totality of the circumstances" as:

> "[1] the opportunity of the witness to view the criminal at the time of the crime,
>
> [2] the witness' degree of attention [to the offender],
>
> [3] the accuracy of the witness' prior description of the criminal,

---

5. The case was decided by a five to three vote. Mr. Justice Brennan, joined by Justices Douglas and Stewart, concurred in part and dissented in part. The dissent, however, was not directed toward the quoted holding. Mr. Justice Marshall did not participate in the decision.

[4] the level of certainty demonstrated by the witness at the confrontation,

[5] the length of time between the crime and the confrontation."

*See also Foster v. State, supra; Witcher v. State,* 17 Md. App. 426, 302 A. 2d 701 (1973).

The United States Court of Appeals for the Fourth Circuit, in *Smith v. Coiner,* 473 F. 2d 877 (4th Cir. 1973) held that *Neil v. Biggers, supra,* applied only to pre-*Stovall* cases.[6] We do not assign to *Neil* such a restricted sphere of influence. We note that the Court of Appeals of Maryland in *Foster, supra,* applied the *Biggers* factors, notwithstanding that the crime in *Foster* occurred in 1973, six years after *Stovall* was decided. It is patent, then, that insofar as this State is concerned, the five factors of *Biggers* are regarded as having a post-*Stovall* application. This Court has also, heretofore, given a post-*Stovall* application to *Biggers. See Witcher v. State, supra. Cf.* 73 Colum. L. Rev. 1168, 1181 (1973).

When the testimony of Brown at the pretrial hearing is measured by the scale of the *Biggers* factors, we find:

(1) A two to three hour opportunity to view the appellant, Dobson, even though the lighting conditions under which that viewing occurred were minimal.

(2) The opportunity to capture a multitude of fleeting glimpses of Dobson.

(3) A matching of Dobson's complexion, wearing of glasses and "funny-shaped nose" against the description given by Brown.

(4) An emphatic certainty of identification upon viewing the photographs.

---

**6.** In Smith v. Coiner, *supra,* the majority held that in pre-Stovall cases "Neil permits admissibility of an identification resulting from suggestive confrontation only when there is substantial reliability of the identification." 473 F. 2d at 883. Judge Murray of the United States District Court for the District of Maryland dissented.

(5) A lapse of slightly less than one month between the crime and the identification.

As a result of our constitutionally mandated independent review of the evidence concerning the photographic identification, we conclude that although the photographic identification procedure, depicting only one person wearing glasses out of fifteen photographs shown, was "impermissibly-unnecessarily suggestive", when the total evidence surrounding that identification is weighed on the scale of *Biggers*, there exists substantial reliability for the identification, and the identification procedure did not give rise to a very substantial likelihood of misidentification. The trial judge, under the totality of the circumstances, properly declined to suppress the judicial identification.

The appellant's second contention is more troublesome. We have previously observed that in addition to indictments charging kidnapping, robbery with a deadly weapon, handgun violations and receiving stolen goods, Dobson was charged with the murder of Scott. The jury convicted Dobson of the robbery and kidnapping of Stephen Brown, a handgun violation and receiving stolen goods, but he was found not guilty of the murder of Scott. During the course of the trial the appellant presented testimony concerning the execution of a search warrant at his Ellamont Avenue residence where he resided with his mother, father and two brothers. Testimony elicited from the appellant's father, uncle and a private investigator, was manifestly designed to show that the inculpatory physical evidence found in the Dobson household had been surreptitiously planted by the police.

It appears from the record that the defense theorized that entrance to the Dobson residence had been gained through a basement door sometime immediately prior to the serving of the warrant and the subsequent search. This theory was, however, strenuously denied by the State's witnesses. Found as a result of the search was, *inter alia*, a .38 caliber revolver which had been stolen from a Burns Detective Agency Security Guard, approximately one week after the kidnap-robbery of Brown. Also found were two shoulder

holsters, a sawed-off shotgun, a pair of hand cuffs, .38 caliber bullets, shotgun shells, a ski mask and some militant literature. The revolver was determined by police ballistics not to have been the weapon used in the murder of Scott, and that particular shotgun could not be connected to the murder. After the Reverend Harold Dobson, appellant's father, had testified concerning the search, the State, on cross-examination, asked him if he had ever seen either of his other sons "with a .38 gun and holster." Reverend Dobson's reply was in the negative. He was then asked, "And what about Sherman, have you ever seen him with a .38 gun and holster?" To which he answered, "No, I haven't." At the conclusion of the defense presentation of evidence, the State then called Carl Sylvester Washington as a rebuttal witness, and the witness testified that in February 1973 he had seen the appellant at 903 Druid Lake Drive. The defense objected and the following discussion occurred at the bench out of the presence of the jury.

> "MR. SMITH [Defense Counsel]: Your Honor, this witness is supposed to be a rebuttal witness, and there has been nothing in the Defendant's case about 903 Druid Park Lake Drive one way or the other, and I don't know what she's rebutting. I don't see how this is rebutting anything that we put on in our case.
>
> THE COURT: The fact that he saw him there.
>
> MR. SMITH: Yes.
>
> THE COURT: You want to make any proffer now?
>
> MRS. O'CONNOR [Assistant State's Attorney]: If the Court wants me to make a proffer, I will. I just want to establish where he was seeing him, And I had only two other questions of him, how many people was he there with and what if anything did he have on him.
>
> THE COURT: Did who have on him?
>
> MRS. O'CONNOR: The Defendant.

MR. SMITH: What would that be rebutting. Rebuttal of what?

MRS. O'CONNOR: We will proffer that he will testify that he had a revolver and a shoulder holster, and that the father, *you directly asked if he carried a gun. He said, no.* And we are entitled to put that on. [(Emphasis supplied).]

MR. SMITH: His father was asked if he had seen a gun. She asked him three questions, about three, and the father said he didn't. That doesn't rebut the father's testimony. Different people see different things. This is not rebutting the father's testimony. The only way she can rebut, if he testified to that. This is not rebuttal.

THE COURT: Let me see, the father said—

MRS. O'CONNOR: Your Honor, the whole defense is going to, you know, how in the world would someone like this get into that house, and number one, and I think we are entitled to show that this young man —

MR. SMITH: Unless she is going to establish that.

THE COURT: That goes to weight. The whole thing, the defense is that he had no gun and never had anything to do with the gun, and guns were planted. They certainly can bring in a witness to say that they had possession of it before, which tends to rebut the fact that this gun was placed there.

MR. SMITH: Possession of what?

THE COURT: Weapon. Whether it was that weapon—

MR. SMITH: She is talking about a .38 caliber revolver, the one recovered. And the witness already came in and testified it

belonged to him and it was taken in July from him. So how—

THE COURT: Is he going to say he had a .38?

MRS. O'CONNOR: He is going to say revolver.

MR. SMITH: Again, if—

THE COURT: It rebuts it on several points. Rebuttal testimony, your case is that he had nothing to do, never had anything to do with any gun. And it seems to me this would be rebuttal."

Washington was then allowed to testify that when he saw the appellant in February, 1973 at the Druid Lake Drive address, Dobson "had a revolver" and that, "It was like in a shoulder holster."

We observe that it was not the defense that asked Reverend Dobson if he had ever seen his son Sherman with a gun, but on the contrary, the question was put to the witness by the State. Appellant argues in essence that the evidence from Washington, if it had been offered by the State in its case in chief, would have been entirely irrelevant because of its remoteness. Appellant then reasons that the same remoteness proscribes its use as rebuttal evidence.

1 *Wharton's Criminal Evidence* § 152 (13th ed. C. Torcia 1972) states:

"The question whether evidence is too remote to be relevant is left to the discretion of the trial judge, and his decision will not be disturbed unless a clear abuse of that discretion has been demonstrated. If given evidence is relevant, the interval of time between the event to which the offered evidence relates and the commission of the offense is a factor for the jury to consider in evaluating the weight or probative value of the offered evidence." (Footnotes omitted).

In *State v. Meyer*, 180 Iowa 210, 163 N. W. 244 (1917), two guns were found at or near the scene of an alleged uxoricide, but neither was the murder weapon. The State, through a

witness, sought to show that the accused had been seen some months before with a gun in his possession, and that it was neither of the two guns that had been found at the scene of the crime. The Iowa Supreme Court in reversing stated that what relevancy this evidence possessed was too remote and not connected in any way to the crime.

The Court of Appeals in *Lane v. State*, 226 Md. 81, 172 A. 2d 400 (1961) said at 90:

"Any competent evidence which explains, or is a direct reply to, or a contradiction of, material evidence introduced by the accused may be produced by the prosecution in rebuttal. *Shanks v. State*, 185 Md. 437, 45 A. 2d 85 [(1945)]. And what constitutes rebuttal testimony in a criminal prosecution is a matter resting in the sound discretion of the trial court."

*See also Smith v. State*, 273 Md. 152, 328 A. 2d 274 (1974); *Felder v. State*, 6 Md. App. 212, 250 A. 2d 666 (1969); *Jones v. State*, 2 Md. App. 371, 234 A. 2d 614 (1967). The key words of *Lane* are "competent evidence which explains, or is a direct reply to, or a contradiction of, material evidence introduced by the accused." We have already seen that it was the State that introduced the fact that Reverend Dobson had not seen his son in possession of a gun. Inasmuch as the State adduced that testimony, it cannot be successfully contended that the accused produced the evidence. Washington's testimony neither explains Reverend Dobson's recitation nor does it contradict it. The question put to appellant's father was whether he had *seen* his son with a gun. We fail to see how Washington's testimony can be construed as a rebuttal to that of Reverend Dobson unless Washington also had stated that at the time he observed appellant with a gun, the Reverend Dobson was present and saw, or should have seen the same thing. It could be argued, and the trial judge apparently concluded, that the State was seeking to rebut the defense theory of "planted" evidence. The answer to that contention is that, patently, the .38 caliber revolver recovered as the result of the July 1973 search, from the Dobson household, could not have been the weapon observed

by Washington in February 1973. This is so because the person from whom it was stolen, Davis, testified that the gun was taken from him on June 25, 1973, a period of approximately four months *after* the alleged viewing by Washington. We have already noted the .38 caliber gun could not have been used in the holdup or kidnapping of Brown because that event occurred approximately a week before the theft of the .38 caliber gun from Davis. We think it clear that Washington's testimony could not have been used by the State in its case in chief because it would have been irrelevant for the State to demonstrate that four months before the events giving rise to this case, the appellant was seen with a gun in his possession. *State v. Meyers, supra.* Possession by the appellant of a weapon four months prior to the happening of a particular event does not give rise to a rational inference that appellant, because of such possession, also possessed other weapons at a later time. Washington's testimony did not serve to rebut anything the defense had demonstrated or implied. The evidence adduced from Washington served only to arouse the passions of the jury by showing that at some point prior to the commission of the alleged offenses the appellant was seen with a gun in his possession, and, thus, to imply that since appellant once had a gun, that prior possession connected him with the offenses charged. We think the use of Washington's testimony obfuscated the real issues by injecting into the trial "evidence of . . . [the] defendant's evil character" in toting a gun in order "to establish a probability of his guilt." *Michelson v. United States*, 335 U. S. 469, 69 S. Ct. 213, 93 L. Ed. 168 (1948). The "fundamental demand for justice and fairness which lies at the basis of our jurisprudence", *Lovely v. United States*, 169 F. 2d 386, 389 (4th Cir. 1948) mandates against the admission of such irrelevant and prejudicial evidence.

The general rule is that in the trial of a criminal case, evidence showing that the accused has committed other independent crimes is not admissible for the purpose of proving guilt or of showing that because a person committed one crime, he is likely to have committed the offense

charged. 1 *Wharton's Criminal Evidence, supra* § 240. "Evidence of other crimes is irrelevant where it does not tend to prove some material fact in connection with the crime charged, or where it merely tends to show that the defendant is a criminal." *See also Bryant v. State,* 207 Md. 565, 115 A. 2d 502 (1955); *Wood v. State,* 191 Md. 658, 62 A. 2d 576 (1948); *Jennings v. State,* 8 Md. App. 312, 259 A. 2d 543 (1969). Of course, evidence of prior criminal acts is admissible if it tends to show a common scheme, plan, design, motive, intent or identity. *Wilson v. State,* 8 Md. App. 653, 262 A. 2d 91 (1970).[7] In the instant case, however, we are unable to find within this record a common scheme, plan or design or other exception to the prior acts rule. While it is true that Washington's deposition tended to underpin the State's case insofar as the appellant's possession of a shoulder holster is concerned, we think that bare thread of evidence is too fine a gossamer upon which to spin the fabric of rebuttal. Washington's perceiving of appellant with the holster was simply too remote from the time of the commission of the crimes charged against appellant. Moreover, there was no testimony from Brown that appellant used a shoulder holster or any other type of holster, nor was a holster the subject of the stolen property charge. It appears that the Washington narration was adduced for the purpose of demonstrating that appellant was a "bad man", a criminal, and thus likely to have committed the offenses for which he was indicted. Consequently, its admission was error.

The State argues that the testimony of Washington, even if error, was harmless beyond a reasonable doubt because there was no resulting prejudice to Dobson. The State reaches this conclusion by starting with the end result, *scilicet,* that Dobson was acquitted of the murder of Scott, *ergo,* the jury was not influenced by Washington's evidence concerning the gun he saw in February 1973. This argument overlooks all of the other charges with which Dobson was

---

7. *See also* United States v. Woods, 484 F. 2d 127 (4th Cir. 1973); Ross v. State, 24 Md. App. 246 (1975).

confronted and the convictions that were handed down by the jury. The argument of necessity presumes that the jury attached no credibility to Washington. It ignores the possibility that the jury, if it had any doubt about Brown's identification testimony, might have resolved those doubts in favor of the State once it was shown that Dobson had at some point in time possessed a revolver.

We are unable to state to what extent, if any, the admission of evidence of the irrelevant, prejudicial, uncharged misconduct influenced the jury's decision. Clearly, however, this is not a case of harmless error. There is present the very real possibility that the improperly admitted evidence contributed to Dobson's convictions. *Fahy v. Connecticut*, 375 U. S. 85, 84 S. Ct. 229, 11 L.Ed.2d 171 (1963). The State's introduction of uncharged misconduct evidence denied appellant the protection which the rules of evidence are designed to afford.

> "Guilt in a criminal case must be proved beyond a reasonable doubt and by evidence confined to that which long experience in the common-law tradition, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights of our system, developed to safeguard [citizens from unlawful] convictions, with resulting forfeitures of life, liberty and property." *Brinegar v. United States*, 338 U. S. 160, 174, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949).

We hold, therefore, that the trial court erred in allowing, over objection, Washington's testimony, and accordingly we reverse and remand the case for a new trial.

*Judgments reversed and case remanded for a new trial.*