JAMES ELLSWORTH BROOKS AND ROBERT ARTHUR BROOKS *v.* STATE OF MARYLAND

[No. 404, September Term, 1975.]

*Decided June 28, 1976.*

The cause was argued before MOORE, LOWE and MELVIN, JJ.

*Frank M. Kratovil, Assigned Public Defender,* with whom were *Edward P. Camus, District Public Defender,* and *Lois C. Rose* on the brief, for appellants.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Robert C. Nally, State's Attorney for Charles County,* and *T. Myron Loyd, Assistant State's Attorney for Charles County,* on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court.

James Ellsworth Brooks and Robert Arthur Brooks were tried jointly by a jury in Charles County (Mitchell, J. presiding), and found guilty of robbery with a deadly weapon on three separate indictments. The main contention of each on appeal is that the trial judge improperly admitted into evidence confessions of each of the defendants.

On September 26, 1974, the I.G.A. Foodliner store in Waldorf, Maryland, was robbed by at least three armed men. None of the victims could identify any of the robbers, but on October 17, 1974, acting on information provided by an informant, the police obtained an arrest warrant for James Brooks. James Brooks was arrested at home, and while he was sitting in the patrol car, the police fooled James Brooks' younger brother, William, into going into the house and bringing back a shotgun that was suspected of being used in the robbery. Later that same day Robert Brooks turned himself in to the police.

On October 25, 1974, James was given a lie detector test

and, according to police officers he made an oral confession. On October 30, Robert Brooks was also given a lie detector test and signed a confession. The police testified that before the confession was taken from each defendant each was informed of his rights, including his right to an attorney, and that each defendant waived his rights.

Appellants attack the admissibility of the confessions on several grounds.

## I

Each asserts that the admission of the confession of the other in their joint trial violated his Sixth Amendment right to confront his accusers. In *Bruton v. United States*, 391 U. S. 123 (1968), the Supreme Court of the United States held that at a joint trial the admission of a non-testifying co-defendant's extrajudicial confession implicating the defendant violated the defendant's constitutional right of confrontation. In the case at hand the extrajudicial confession by each defendant implicated himself and his co-defendant. Under the rule in *Bruton* neither confession should have been admitted at their joint trial unless the defendant who made the confession testified and was subject to cross-examination.

The trial court in considering the point at the time of the objection gave the following reasons for admitting Robert Brooks' confession, the first to be offered by the State:

> "THE COURT: . . . I think your motion would be premature at this time or your objection [sic].
>
> We don't know until the State has concluded whether the introduction of this confession . . . is prejudicial or not.
>
> MR. KRATOVIL: The confession has been read, Your Honor.
>
> THE COURT: Yes, but confessions should be admitted in evidence and considered to be non-prejudicial, if there is other evidence. Until the State has concluded its case, we don't know what the other evidence might be."

It is patent that the trial judge was invoking, anticipatorily, the harmless error doctrine. The harmless error doctrine is of course not a rule of evidence to be applied by trial judges in determining questions of admissibility. While it is true that the Supreme Court in *Brown v. United States,* 411 U. S. 223 (1973), ruled that violations of *Bruton* may amount to harmless error where other evidence against the defendants is overwhelming, the Court did not say that the confessions were properly admitted; rather it held that even though the confessions were *erroneously* admitted, the *error* was cured.

Even if at the time the State offered the confession of Robert into evidence, the State had already introduced overwhelming evidence against James, the character of the other evidence could not change the status of the admissibility of the confession. In a joint trial, *Bruton* proscribes the admission of a non-testifying co-defendant's confession which implicates another co-defendant. It was a clear violation of *Bruton* to admit either the confession of Robert or James Brooks in their joint trial during the State's case in chief as was done here.

In this instance, however, any violation of the confrontation clause was cured when each defendant thereafter took the stand and was subject to cross-examination.

In *Nelson v. O'Neil,* 402 U. S. 622 (1971), the Supreme Court held that where a co-defendant, whose extrajudicial statement is introduced at a joint trial, takes the stand at the joint trial, there is no violation of the Sixth or Fourteenth Amendment since the other co-defendant then has the opportunity to confront his accusers. In the case *sub judice,* each defendant took the stand to testify after the confessions were admitted in evidence. James Brooks denied making any inculpatory statement at all, and Robert, though admitting he signed a written statement implicating himself and James in the robbery, denied the truth of the statement claiming he was forced to sign by threats of violence made to him by the interrogating officer. Under the circumstances we hold that any *Bruton* error committed

when the confessions of Robert and James were admitted in evidence was cured. *Nelson v. O'Neil, supra.*

## II

Appellants also contend the confessions should not have been admitted because a) they "were not provided with the assistance of counsel until after interrogation and confession in spite of their requests and an apparent referral by the court for such appointment and therefore they could not be found to have waived such rights"; b) they "were subjected to direct inducements which led to the alleged confessions"; and c) James Brooks' confession was elicited without prior *Miranda* warnings. We find no merit in any of these contentions.

### (a)

The record reflects that promptly after their arrests on October 17, 1974, both appellants were taken before a District Court Commissioner at Waldorf, Maryland, and the following day were brought before the Maryland District Court in La Plata, Maryland. M.D.R. 709. They contend that even though the District Court Judge indicated counsel would be appointed for them, no counsel was appointed until after they were interrogated by the police. James Brooks was interrogated on October 25, 1974, and Robert on October 30, 1974. Although the record is silent as to when a public defender was actually appointed to represent appellants, the public defender ultimately assigned to them stated to the court below that he was unaware of his appointment until October 31, 1974. From these facts, appellants argue they were denied their constitutional right to the assistance of counsel at the time they were questioned by the police on October 25, 1974 (as to James) and October 30, 1974 (as to Robert). The difficulty with the argument is that the trial court believed the police testimony that before the questioning took place each appellant was informed of the full panoply of his *Miranda* [1] rights and voluntarily waived

---

1. Miranda v. Arizona, 384 U. S. 436 (1966).

them before answering any questions. The issue of whether appellants were informed of their constitutional rights to counsel created essentially an issue of fact for the trial judge to resolve. We give great weight to his finding on the issue (*Walker v. State*, 12 Md. App. 684, 694 (1971)), and upon our own independent review of the record find that each appellant was informed of such right, that each had the opportunity to exercise the right, and that each effectively waived the right.

### (b)

The contention of each appellant that they were "subjected to direct inducements which led to the alleged confessions" is not supported by the record.

### (c)

The claim of appellant James Brooks that his oral confession was elicited without having been given *Miranda* warnings is based on the testimony of Trooper Rockel that prior to questioning James on October 25 he gave no such warnings. The record is clear, however, that Trooper Rockel questioned appellant immediately after appellant had been questioned by Sergeant Somers in an adjoining room; that Sergeant Somers had fully advised appellant of all his *Miranda* rights and appellant had waived them before giving substantially the same statement he immediately thereafter gave to Trooper Rockel. Under these circumstances, it was not necessary for Trooper Rockel to renew the *Miranda* warnings or that James again waive his rights. See *Brown v. State*, 6 Md. App. 564, 569 (1969), and cases there cited.

### III

Appellants' final contention concerning the admissibility of their confessions is that they were "inadmissible under the doctrine of the 'fruits of the poisonous tree' ".

During the trial, before the confessions were admitted in evidence, the State made known its intention to offer in

evidence the shotgun given to the police by appellants' younger brother, William, at the time of James' arrest. Appellants objected, claiming the shotgun was obtained in violation of their Fourth Amendment protections against unlawful search and seizure. A hearing was then held out of the presence of the jury during which evidence was heard concerning the circumstances of the obtention of the weapon by the police. Trooper Rockel described the arrest and how he obtained the shotgun:

"Q. . . . And would you tell the Court how you came into possession of that weapon?

A. On the 17th I went to the Brooks residence and arrested James Elsworth Brooks. I then took him to the police car and while we were seated in the police car before leaving the residence he stated to me to instruct his brother to remove the frying pan from the stove because —

Q. Which brother was this?

A. He didn't specify the brother. He indicated he was cooking breakfast at the time he was arrested. Then [I] went to the house and I told his younger brother, his name is William Brooks, I said that your brother wants you take the frying pan off the stove and to bring out a shotgun, the one that is shorter than the others. And he then removed the frying pan from the stove and then went and got the shotgun and brought it to me.

\* \* \*

A. I was in the doorway of the, in fact, I didn't step inside until he was approaching me with the gun. And at that point I stepped toward him to get the gun."

Trooper Rockel also testified that prior to obtaining the shotgun from William no police officers conducted any search of the premises and that he "had no idea where the weapon was or if in fact it was positively there". He further

testified that James "had requested the frying pan be removed but not that the shotgun be brought out".

Appellant James Brooks then testified, out of the presence of the jury, that the shotgun belonged to him and had been kept in his bedroom. Appellant Robert Brooks testified, also out of the presence of the jury, that he lived in the house with James and William. The younger brother William was not called to testify by either the appellants or the State.

The trial judge ruled that the seizure of the shotgun was illegal and suppressed it as evidence. The judge felt the circumstances amounted "to an agent of the police going into the house and bringing out the weapon". "It is so to speak a long arm search and not fitting into any of the categories permitted". Implicit in his ruling was his conclusion that William was not "in a position to give consent to the policeman by his long arm, to wit, the minor brother going into the room and bringing out this weapon". For the purposes of this appeal, we shall assume without deciding, that the trial judge was correct in his ruling.

Appellants contend that the shotgun, ruled by the trial judge to have been illegally seized, was used by Trooper Rockel in eliciting their confessions and therefore each confession was inadmissible as being the "fruit of the poisonous tree" and therefore violative of the Fourth Amendment exclusionary rule.

In *Ryon v. State*, 29 Md. App. 62 (1975),[2] Chief Judge Orth (now an associate judge of the Court of Appeals) considered at length the Fourth Amendment exclusionary rule and the application of that rule in determining the admissibility of confessions following an illegal arrest or an otherwise illegal search and seizure. Chief Judge Orth summarized the law as follows, at 71:

> "The teachings of *Wong Sun*[3] and *Miranda*, as explicated in *Tucker*[4]and *Brown,*[5]are clear.

---

2. Decided November 26, 1975, after the briefs in the instant case were filed.

3. Wong Sun v. United States, 371 U. S. 471 (1963).

4. Michigan v. Tucker, 417 U. S. 433 (1974).

5. Brown v. Illinois, 95 S. Ct. 2254 (1975).

1) The Fourth Amendment exclusionary rule applies equally to statements and tangible evidence obtained following an illegal arrest *or an otherwise illegal search and seizure.*

2) Such statements are not rendered inadmissible simply because of the illegal arrest *or unreasonable search and seizure.*

3) Such statements are not rendered admissible simply because the *Miranda* warnings were fully given.

4) Admissibility of such statements, *vel non,* must be answered on the facts of each case, upon consideration of:

    (a) the voluntariness of the statement, which is a threshold requirement;

    (b) compliance with the *Miranda* safeguards, which is important in determining whether the statements were obtained by exploitation of the illegal conduct;

    (c) other relevant factors, such as

        (i) the temporal proximity of the arrest and the confession;

        (ii) the presence of intervening circumstances; and

        (iii) 'particularly, the purpose and flagrancy of the official misconduct.' " (Emphasis supplied.)

In the instant case, upon our independent review of the record we find that the confessions were voluntary in the traditional sense [6] and that all *Miranda* requirements were met. Consequently, no Fifth Amendment right against self-incrimination was violated. There remains the "other

---

**6.** *I.e.,* they were made "freely and voluntarily and at a time when the accused[s] knew and understood what [they] were saying". Koprivich v. State, 1 Md. App. 147, 151 (1967). See also Hadder v. State, 238 Md. 341 (1965); Wiggins v. State, 235 Md. 97 (1964); Bryant v. State, 229 Md. 531 (1962).

relevant factors" to be considered, keeping in mind that in determining the application of the Fourth Amendment exclusionary rule to a confession the ultimate question to be decided is whether the confession was "sufficiently an act of free will to purge the primary taint" of official misconduct, *Brown v. Illinois*, 95 S. Ct. 2254, at 2261, and that the question

> " . . . must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test". *Id.* at 2261.

### Temporal Proximity

During the hearing out of the presence of the jury to determine the admissibility of the shotgun, Trooper Rockel testified that he "mentioned" the shotgun "on several occasions" in his interrogation of both appellants:

"Q. All right. You were also involved, were you not, in the interrogation of Robert and James Brooks; is that correct?

A. Yes, sir.

Q. During that interrogation, or in any of the interrogations, or questioning, did you refer to the sawed-off shotgun?

A. Yes, sir.

Q. How may times would you say?

A. Well, with both of them it was mentioned on several occasions. Especially with James it wasn't necessary to mention it as much because we took the weapon back in the car with him when we took him back to the Barrack.

Q. Yes. What I mean by that, Trooper, to get directly to the point, in your questioning of him, you referred to the fact, 'Well, we have got the shotgun,' or words to that effect?

126

A. Yes, sir.

Q. And it was used as an inducement, was it not, in obtaining information from him?

MR. LOYD: Objection as to the term characterization an inducement.

THE COURT: Objection is overruled.

THE WITNESS: It was not used as an inducement by me because they never told me anything as a result of questioning.

BY MR. KRATOVIL:

Q. All right, let me withdraw the inducement and ask if it was used as an investigative technique?

A. I mentioned the shotgun when interviewing both of them, mentioning the shotgun when I talked with them did not produce any statements. In fact, they both denied knowing anything about the weapon or robbery.

Q. Subsequently they did make statements, though, is that correct?

A. Yes, sir.

Q. Were you present at those statements?

A. I was present not at the time they initially gave a statement admitting to the robbery, but subsequent to that I sat in on an interview with both of them.

Q. Excuse me. I didn't hear you.

A. I sat in on an interview subsequent to after they told Sergeant Somers about what happened.

Q. In those interviews was the shotgun referred to in the questioning?

A. Yes, I asked questions as to whose shotgun it was.

Q. How many times would you say it was used?

A. Once.

Q. Just one time?

A. In the subsequent questioning when I questioned them I asked them whose it was and they told me.

Q. That was the questioning by you.

Now, how about the questioning by anyone else?

A. I have no idea if it was mentioned.

Q. I mean when you were present.

It was mentioned at least once, was it not?

A. When I was present I asked them once about the weapon. I don't recall Sergeant Somers, who was the only other man questioning them, asking them at all about the shotgun."

The record is silent as to when Trooper Rockel's *unsuccessful* interrogations of the appellants took place. The record shows that James Brooks orally confessed to him on October 25, 1974, eight days after his arrest and seizure of the shotgun, and that Robert gave him a written confession on October 30, 1974, thirteen days after his arrest. Both confessions to Trooper Rockel followed immediately after each appellant had orally confessed to Sergeant Somers. Sergeant Somers testified that he did not mention the shotgun during the only times he questioned appellants, i.e., on October 25 (James) and October 30 (Robert).

There is no indication in the record that either appellant was questioned by the police between the time they were taken to the Charles County jail in La Plata, on October 17th and the time they confessed on October 25 (James) and October 30 (Robert). It appears, therefore, that Trooper Rockel's initial and unsuccessful questioning, during which he informed them that "Well, we have got the shotgun", took place sometime between their arrest around noon on October 17 and the time they were incarcerated at La Plata at approximately 9:00 P. M. that same day.

Assuming as we do that the shotgun was obtained illegally, any information pertaining to the fact that it was in the possession of the police should not have been used by

Trooper Rockel in his questioning of appellants, the obvious purpose of which was to extract confessions from them. Such use becomes the "fruit of the poisonous tree" and is proscribed:

> "The doctrine of the 'fruit of the poisonous tree' extends the scope of the exclusionary rule to bar not only evidence directly seized, but also evidence indirectly obtained as a result of information learned or leads obtained in the unlawful search; in its broadest sense it prohibits the prosecution *from using in any manner*, prejudicial to the accused, information derived from facts learned as a result of the unlawful acts of law enforcement agents". (Emphasis supplied.) *Everhart v. State*, 274 Md. 459, at 481-482.

As made clear by this Court in *Ryon v. State, supra,* at 62, however, the use of such information does not automatically mandate the exclusion from evidence of a confession that follows such use. The burden is upon the State to show that the taint of the illegal use has been purged. *Bates v. State*, 31 Md. App. 108 (1976).

Here, so far as "temporal proximity" is concerned, the improper use of information gained during the illegal search and seizure occurred on October 17 when appellants were told during questioning by Trooper Rockel, "Well, we have got the shot gun, or 'words to that effect' ".[7] James confessed eight days later on October 25 and Robert confessed thirteen days later on October 30. We find nothing improper in the questioning on those dates. Trooper Rockel obviously knew from the victims of the holdup that a sawed-off shot gun had been used by the robbers. Merely asking who owned the weapon was not improper.

### Intervening Circumstances

The record shows that between the time appellants were

---

[7]. We observe, of course, that as to James he obviously already knew this because he *saw* the weapon in Trooper Rockel's possession.

questioned on October 17 and the time they confessed, appellants were taken before the District Court on October 18 and then returned to the La Plata jail. There is no indication they were thereafter further questioned by the police until October 25 (as to James) and October 30 (as to Robert).

### Flagrancy of the Official Misconduct

We deem the misconduct of Trooper Rockel to be minimal in nature and in no way "flagrant". At the time he questioned appellants on October 17, shortly after their arrest, he had no way of knowing that the manner in which he obtained the shotgun would be deemed illegal by the trial judge, and we think it too much to expect of him that he should have known that his method of obtaining it violated any Fourth Amendment rights of the appellants. Indeed, although we have assumed for the purposes of this appeal that the trial judge's ruling was correct, we think judicial minds might well differ on the issue. Of course, if the shotgun were legally obtained, the references made to it during questioning of the appellants would have been perfectly proper.

### Other Circumstances

Aside from the "relevant factors" described above, there are other circumstances in this case we consider highly relevant to the issue before us. By their own testimony the appellants negate any causal connection between Trooper Rockel's references to the shotgun and their confessions.

As already mentioned, James Brooks denied making a confession at all. When asked if the police questioned him about the shotgun, he testified as follows:

"Q. . . . After Trooper Rockel came out of the house, was he carrying a shotgun?
A. Yes, he was.
Q. Was your brother carrying it at all?
A. Nope.

Q. What did he do with the shotgun?

A. Brought it to the car.

Q. What did he do with it?

A. Kept it up front with him.

Q. Did he ask you anything about it?

A. Not at the time being.

Q. Later did he?

A. Yes.

Q. You were questioned by the police, were you not?

A. Yes, I was.

Q. At the time they questioned you, they asked you about the shotgun, did they not?

A. Yes.

Q. They mentioned it?

A. I think they did.

Q. Pardon?

A. I think so."

\* \* \*

"Q. Now when you were questioned by Detective Somers and Trooper Rockel, did they mention the shotgun in their questions to you?

A. I can't remember, no."

At trial, Robert Brooks was asked no questions concerning any references to the shotgun before his confession was admitted in evidence. When asked why he signed his confession his reply was: "Yes, they threatened to beat me if I didn't give a statement, yes". After his confession was admitted in evidence, he told the jury the reason he confessed was because of "fear" of being beaten by the police.

Thus, there is no claim or indication by either of the appellants themselves that references to the shotgun induced their confessions. This circumstance, together with

the other factors already discussed, convinces us, upon our independent review of the record, that the State met its burden of showing that the "causal chain" (*Brown v. Illinois, supra,* at 602) between the illegal seizure of the shotgun (and any subsequent use thereof) and the confessions was broken. In short, we find that the taint of any Fourth Amendment violation has been purged and the confessions properly admitted.

## IV

Appellant Robert Brooks contends the trial court erred in allowing certain questions on his cross-examination concerning his use of marijuana. Appellant's brief refers to the questions and answers occurring at pages 228 and 229 of the transcript. There was no questioning of Robert Brooks on pages 228 and 229 of the transcript. On pages 328 and 329 there are several unobjected to references to marijuana. Obviously, if these are the questions appellant is referring to, his contentions have not been preserved for appeal since they were not objected to at trial. Md. Rule 1085. See also Rule 1031 d 4.

There were several questions regarding Robert's use of marijuana on page 326 of the transcript which were objected to by counsel. Robert had just stated that everything in his confession was a lie. The State was asking about particular statements in the confession and asking if they were lies. The questions to which objections were made referred to the statement in the confession that Robert was riding around getting "high". Robert responded negatively to the questions about whether he was getting high on marijuana or got high on marijuana every day. In light of appellant's denials in response to the questions and because we feel the questions were proper cross-examination, we find no merit in appellant Robert Brooks' contentions.

## V

Finally, appellant James Brooks contends that the State should not have been permitted to introduce on rebuttal

evidence that James had voluntarily consented to taking a lie detector test. On direct examination James testified he took a lie detector test. On cross-examination he denied signing a consent form. In rebuttal, the State presented evidence that James voluntarily signed the consent form and, over objection, introduced the signed form in evidence. We see no error. *Dobson v. State*, 24 Md. App. 644 (1975).

*Judgments affirmed.*